933 P.2d 1353

**Rebecca Jane JACKSON, Plaintiff–Appellant/Cross–Appellee,**

v.

**Ernest James JACKSON, Defendant–Appellee/Cross–Appellant.**

No. 16067.

Intermediate Court of Appeals of Hawai'i.

Feb. 21, 1997.

**322**

Dennis W. Jung, on the briefs, Honolulu, for plaintiff-appellant/cross-appellee.

William C. Darrah and Lucinda John, on the briefs, Honolulu, for defendant-appellee/cross-appellant.

Before BURNS, C.J., and WATANABE and KIRIMITSU, JJ.

BURNS, Chief Judge.

Plaintiff Rebecca Jane Jackson (Rebecca) appeals the family court's March 13, 1992 Divorce Decree (Divorce Decree). Defendant Ernest James Jackson (Ernest) cross-appeals the Divorce Decree and appeals the April 6, 1992 Order Granting Motion and Affidavit for Relief After Order or Decree (April 6, 1992 Order). We vacate the division and distribution of the marital partnership property (Marital Partnership Property) part of the Divorce Decree and remand for reconsideration in the light of this opinion. We affirm the April 6, 1992 Order.[1]

## BACKGROUND

Rebecca was born in 1941, married in 1963, and had a child in each of the following years: Niko in 1964, Kima in 1967, Kali in 1970, and Kobi in 1973. Rebecca was divorced in 1976.

Ernest was born in 1936, married Mary in 1953, had three children, and was divorced in 1963. Ernest married Pearl in 1965 and was divorced in 1985.

Ernest and Rebecca met in 1982. Commencing December 1983, Rebecca and her two youngest children lived on a ranch in Oklahoma owned by one of Ernest's corporations. In December 1984, Rebecca and three of her children moved to a property in Hale'iwa rented by Ernest. In June 1985, Ernest acquired a seven-acre property on Ahilama Street in Kahalu'u (Ahilama property) and Rebecca and three of her children lived there or nearby while the residence was renovated and an arena, barn, and garage were constructed.

Notwithstanding periods when their relationship deteriorated and they separated, Rebecca and Ernest married on March 28, 1987. The date of their final separation in contemplation of divorce (the DOFSICOD) was Sep-

1. Although we vacate the family court's March 13, 1992 Divorce Decree, it is not necessary to vacate the April 6, 1992 Order Granting Motion and Affidavit for Relief After Order or Decree. Primarily, it ordered Ernest James Jackson (Er-

nest) to pay to Rebecca Jane Jackson (Rebecca) by December 31, 1991, $100,000 of the amount he was ordered to pay her as property distribution. This amount is less than the revised divorce decree will award Rebecca.

tember 21, 1990. The trial occurred on September 3, 4, 5, 6, 10, and 12, 1991. The date of the conclusion of the evidentiary part of the trial (the DOCOEPOT) was September 12, 1991. The family court orally decided the case on November 1, 1991. On November 21, 1991 each party filed a motion for reconsideration. On December 24, 1991 Ernest moved under Hawai'i Family Court Rules (HFCR) Rule 60(b) for an adjustment because a court settlement had caused the debt owed by Ernest's corporation, Oahu Interiors, Inc., to the Bank of Hawaii to be $1,100,-000 rather than $1,715,043. The family court orally decided the motions on December 27, 1991. On March 13, 1992, the family court entered orders deciding the motions, and then it entered the Divorce Decree. The April 6, 1992 Order granted Rebecca's March 25, 1992 motion for various orders implementing certain details of the property division.

On June 8, 1992 the family court entered its findings of fact (FsOF) and conclusions of law (CsOL). The FsOF state in relevant part as follows:

9. In 1964 [Ernest] formed Oahu Interiors. By 1968 it was one of the largest drywall contracting firms in Hawaii [Hawai'i].

10. In January 1977 Oahu Interiors entered into a contract with MGM, Inc. in Reno, Nevada to do the drywall work for construction of the MGM Grand Hotel. According to [Ernest], this was the largest drywall contract let in the United States up to that time. [Ernest] borrowed funds from Bank of Hawaii ("BOH") in connection with this job. Delays and cost overruns led to litigation with MGM and subsequently with BOH. Litigation started in 1979. The trial commenced in November 1982 and ended in February 1983. Oahu Interiors lost the suit against MGM, and was left with a substantial debt to BOH. See Finding 36.

11. In 1980 [Ernest] formed Jackson Construction Co., Ltd. ("Construction"), a general contracting firm, as a subsidiary of Oahu Interiors. Construction entered a partnership with Pacco (a subsidiary of Pacific Construction) which became known as Jackson Pacific Joint Venture ("JPJV").

12. In 1981 [Ernest] and Mr. [Patrick] Hart formed the partnership known as Jackson and Hart Associates ("JHA"). Before and after DOM [date of marriage] [Ernest] and Hart also engaged in other partnership ventures. They developed a warehouse and office complex at the airport known as South Ramp Partners, and engaged in such other enterprises as H.C. Halawa Center, 731 Associates and J & H Helicopters, Mauna Kea Partners and a partnership to acquire property in Texas. Those still in existence at DOCOEPOT are shown in Chart I attached hereto. *Muraoka v. Muraoka*, 7 Haw.App. 432 [776 P.2d 418] (1989).

13. The parties met at a trap shooting competition in Las Vegas on September 25, 1982.

\* \* \*

17. In April 1983 the parties took a trip to Oklahoma to look for a ranch. [Ernest] signed an agreement to purchase 200 acres with a house in Sallisaw, Oklahoma. [Ernest] returned to Hawaii [Hawai'i] and [Rebecca] to California. In July the parties returned to Oklahoma together and [Ernest] took title to the property in a corporation known as Rocking J Ranch ("RJR").

\* \* \*

19. Sometime in 1984 [Ernest] acquired an interest in 4,000 acres in Waialua and formed Waialua Ranch Partners, a limited partnership entity. A 6,000 square foot residence, employee dwellings, an arena, barns and other structures were eventually built. The ranch is an operating cattle and goat ranch with the limited partners being able to use the residence.

20. On September 5, 1984, [Ernest] signed an AITD [Agreement Incident to

Divorce] with Pearl. However, problems continued and [Ernest] expressed his concerns to [Rebecca] that he was worried about economic claims against him should they eventually marry. [Rebecca] reassured him. A modification to [Ernest's] AITD was signed in January 1985, and a Divorce Decree was filed on March 25, 1985.... [Ernest's] property interests were valued on a Family Court Asset and Debt Statement as shown on the financial statements of Oahu Interiors, RJR and JHA. The totality showed a zero estate— real property with a net market value of approximately $250,000 and other assets with a net negative value of $258,444....

\* \* \*

23. On August 20, 1985 [Ernest] signed a one-year lease on a rental property at Ahulimanu ['Ahulimanu] Place, Kahaluu [Kahalu'u] so that the parties could live close to the Ahilama Road property during construction of improvements. [Rebecca] and her three children were named as tenants but [Rebecca] did not sign. The parties moved in together. [Rebecca] participated in the planning of construction of improvements to Ahilama. The "guest house" was remodelled [sic], a barn with horse stalls and covered arena were constructed and the property was cleared. A "main residence" was planned but apparently not built by DOCOEPOT because of permit problems. [Rebecca] was of assistance in obtaining permits, cleaning the property and other miscellaneous ways. However, she did not provide major input to the architect.

\* \* \*

26. Prior to DOM, [Ernest] and [Rebecca] did not have any express or implied

agreement for an economic partnership or as to what would happen financially if the parties' relationship ended. [Ernest] supported [Rebecca] and her children, provided medical insurance for [Rebecca] and children and paid the children's private school tuition during the periods they were residing together. The parties did occasionally allow each other to use their individual credit cards for limited purposes. [Rebecca] also lent [Ernest] money from time to time.... At date of trial, [Ernest] still owed [Rebecca] $35,500. The parties had no joint bank accounts or joint debts. Nor did they purchase any property jointly although a 1986 Oklahoma newspaper article ... reported that the Rocking J was owned by Jackson and Hall—an impression that was apparently not corrected by the parties. [Ernest] assisted [Rebecca] financially to start a perfume business and a computer-generated portrait business. [Rebecca] contributed effort to both the Rocking J Ranch while she resided there and the Ahilama property prior to the marriage as described in Findings 18 and 23 hereinabove. Both before and during the marriage she assisted with business parties, attended conventions with [Ernest], decorated an office, and did some clerical tasks for Rocking J and the construction business. [Ernest] did not want her to become extensively involved in his business ventures.

27. The economic ties described in paragraph 25 and the other ties described in the preceding paragraphs do not rise to the level of using date of living together ("DOLT")—whatever that was in this case (not necessary for the Court to determine) as the applicable date for "category 1"[2] determination. However, the length of the parties' relationship prior to marriage, the

**2.** The five categories of net market values (NMVs) are as follows:

Category 1. The [NMV], plus or minus, of all property separately owned by one spouse on the date of marriage (DOM) but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.

Category 2. The increase in the NMV of all property whose NMV on the DOM is included in category 1 and that the owner separately owns continuously from the DOM to the DOCOEPOT [date of the conclusion of the evidentiary part of the trial].

Category 3. The date-of-acquisition NMV, plus or minus, of property separately acquired by gift or inheritance during the marriage but

nature of that relationship and of [Rebecca's] contributions to the DOM net market value of [Ernest's] separate assets are relevant circumstances in determining appropriate deviations from starting points in distribution of those assets (see *Malek v. Malek*, 7 Haw.App. 377 at 382, [768 P.2d 243] 1989)[sic], and are relevant to the "respective merits of the parties" as that term is used in HRS [Hawai'i Revised Statutes] Section 580–47(a).

28. After DOM the parties continued to own property as previously titled and maintained separate accounts. No significant assets were transferred to joint names.

29. On June 4, 1987, the parties, Kali and Kobi moved into the "guest house" at Ahilama. (The projected main residence had not been constructed by DOCOEPOT.) This was the parties' "marital residence" throughout the marriage. Kali and Kobi left in 1988 for the mainland. (During the fall of 1987, [Ernest's] cousin began to live there and did work on the property, and from time to time various of [Ernest's] children and grandchildren resided with the parties.[) ]

30. Further work on the property included construction of the covered arena and a barn with stables. The arena is 100 feet by 200 feet. The barn contains ten stalls, a tack room and a trainer's office. The parties also leased an adjacent 5 acres and operated a landfill on the property. [Rebecca] and daughters monitored and kept records of the trucks and the materials which they delivered to the landfill. [Rebecca] brought goats from [Ernest's] Waialua ranch and raised them for sale by the Waialua entity, and started a Manila palm nursery with approximately 1,000 plants which remained on the property when she left.

\* \* \*

33. For purposes of identification and categorization of assets, the Court has deemed as category 1 the net value [of] each asset owned by parent entities at DOM and as category 2 the appreciated value at DOCOEPOT of each asset owned at DOCOEPOT by an entity which existed at DOM. In those instances where an asset was not owned by the existing parent entity at DOM, the category 1 value was found to be 0 and the entire DOCOEPOT value as category 2, e.g., the Washington condo owned by Construction whose parent is Oahu Interiors was not yet purchased by Construction/Oahu at DOM so its entire NMV is category 2. The Court has not attempted to trace what marital accumulations or income were contributed post-DOM to pre-existing entities. Where an asset acquired during the marriage was sold and its proceeds used to purchase substitute assets, e.g. Wailuku Park Square>Mauna Kea>Houston, tracing was necessary so as not to duplicate or double count assets which were no longer in existence alongside the category 5 value of the presently existing assets purchased as a result of the same funding. The Court's findings as to category 1(DOM), categories 2 and 5 (DOCOEPOT) values, their uniform starting points ("USP") for distribution and the Court's deviations from those USP's are tabulated in Chart I attached hereto. The Court's actual award of assets was as shown in Chart II attached hereto.

34. [Ernest's] asset[s] and debts fall into four main categories: Oahu Interiors

excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.
Category 4. The increase in the NMV of all property whose NMV on the date of acquisition during the marriage is included in category 3 and that the owner separately owns continuously from the date of acquisition to the DOCOEPOT.

Category 5. The difference between the NMVs, plus or minus, of all property owned by one or both of the spouses on the DOCOEPOT minus the NMVs, plus or minus, includable in categories 1, 2, 3, and 4.
*Tougas v. Tougas*, 76 Hawai'i 19, 27, 868 P.2d 437, 445 (1994) (quoting *Malek v. Malek*, 7 Haw. App. 377, 380–81 n. 1, 768 P.2d 243, 246–47 n. 1 (1989)) (brackets in original).

and subsidiaries, Jackson and Hart Associates, Rocking J Ranch, and those owned individually.

*OAHU INTERIORS:*

* * *

36. Oahu Interiors has a significant liability to Bank of Hawaii ("BOH") arising from the 1979 MGM project. In 1979 and 1980 promissory notes to BOH were executed in a total principal sum of about $720,000. The DOM principal and interest balance due was $1,335,894. At DOCOE-POT the Court determined that additional interest due between DOM and DOCOE-POT (a negative category 2) was $379,149 for a total debt of $1,715,043.... Following DOCOEPOT the BOH litigation was settled. At a December 27, 1991 hearing on [Ernest's] Motion for Relief under HFCR 60(b) filed December 24, 1991, the Court modified its findings to reflect the actual amount owing to BOH pursuant to the settlement, a sum of $1,100,000. Accordingly the category 1 negative value for this debt is $1,100,000 with no category 2 change. (This change has not been reflected on page 1 of Chart I. Instead an adjustment was made on page 3 of Chart II. See also Finding 68 below.)

37. Oahu Interior's primary asset is Construction. The principal assets of Construction are a development project on Maui known as Haiku Development—Phase II ("Haiku II"), a 50% interest in JPJV, a 24% interest in the Wahiawa Development Partnership which owns a commercial building in Wahiawa [Wahiaw]....

38. At DOM, Construction owned 17 lots in Haiku [Ha'ikū], Maui ("Haiku I"). Those lots were sold prior to DOCOEPOT.

39. In 1989 Construction commenced negotiations, and in December 1990 acquired, another 35 acres in Haiku [Ha'ikū] (Haiku II). The 17 lots have been appraised at an average value of $204,000 each, or a total value of $3,468,000. Acquisition and development costs will total ap-

proximately $2,700,000, leaving a profit of $768,000. Construction entered a management contract for this venture with a John Schneider. Thus Construction's net profit should be $615,000. The Court deviates from [Rebecca's] 25% starting point entitlement to 10% as this transaction largely occurred post-separation. (See also Findings 43 and 52 as bases for deviation.)

* * *

41. On June 1, 1981 Construction leased land from Hawaii Meat Company, Ltd. in Ewa ['Ewa] on which it operated a landfill until 1988. On October 3, 1988 the State Department of Health initiated proceedings against Construction contending that the landfill was being operated without proper permits. That proceeding seeks damages and penalties of up to $10,000 per day and is still pending. On December 28, 1988 the City and County of Honolulu determined that the landfill was being operated in violation of county ordinances. An adverse determination by the Department of Land Utilization (DLU) was affirmed by the Zoning Board of Appeals (ZBA) on September 14, 1990. The ZBA found that illegal materials were deposited in the landfill and that corrective action must be taken and should have been completed by May 8, 1989. Exhibit EE was not credible evidence from which the Court could determine the probable cost of correction. The cleanup estimate of Koga Engineering was the only estimate presented and it was presented for the first time during trial. Koga is also doing sitework for [Ernest's] Halawa Center project. Construction has appealed the ZBA's order to the Circuit Court.

* * *

43. Other assets and liabilities of Construction are as shown on pages 2 and 3 of Chart I attached hereto. The Court found no reason to deviate from USP as to any of Oahu/Construction's assets or liabilities except in regard to the Haiku II lots. Due

to the fact that this property was purchased and developed almost entirely after separation and after the end of viability of the marital relationship, without any active participation by [Rebecca], the Court deviated by awarding [Rebecca] only 10% of the category 2 value of this asset. Moreover, although this particular asset was only purchased after DOM, it is owned by a pre-DOM entity whose pre-DOM and post-DOM but preseparation financial structure made this development possible.

## JACKSON AND HART ASSOCIATES: (JHA)

* * *

45. In 1981 JHA acquired the stock of Paradise Helicopter Corporation which owned a lease for land on Lagoon Drive. JHA built a commercial building on this property. JHA also owns a Prospect Street residential condominium, and some cash and receivables and has some liabilities. See page 4 of Chart I for specific findings as to the relevant values of JHA assets and liabilities. The Court found Mr. McEnerny's conclusion in Ex. BB that the December 1990 value of the Paradise building was the same as the DOM fair market value of $1,840,000 not credible. The Court relied on the $2,500,000 value stated in Exhibit 8A(3). The asset known as H.C. II was sold during the marriage. [Ernest] used his distribution to purchase 5,000 shares of Liberty Bank stock for $150,000 (worth $132,500 at DOCOEPOT, see page 10 of Chart I), to pay down the GECC loan outstanding on the Ahilama property at the time of the distribution, and to pay Mr. Miccio $300,000 for Miccio's interest in property in Stockton[,] California which [Ernest] and Miccio owned (See Finding 56 below). [Ernest's] 50% interest in the assets owned by JHA at DOM have a category 1 value, and those that have appreciated during the marriage have a category 2 value. The Court found no reason to deviate from USP's in regard to [Ernest's] interest in JHA or any of its assets.

## ROCKING J RANCH:

46. [Ernest] is the sole shareholder of the Rocking J Ranch ("RJR"), an "S" corporation formed in 1984 to acquire the Oklahoma ranch. The Oklahoma assets of RJR include 200 acres on which [Ernest] constructed four barns, an additional contiguous 40 acres on which is situated a brick house, and a 50% interest in 680 acres nearby. DOM and DOCOEPOT values are shown on page 6 of Chart I. Based on the fact that the parties purchased the land together, albeit with [Ernest's] funds and in [Ernest's] name, and based on the other facts stated hereinabove in Findings 18, 26 and 27, the Court deviated from USP by awarding [Rebecca] 20% of the category 1 value of this property. The Court concluded that it was fair under all the circumstances of the case that [Rebecca] receive some value for this asset based upon her relationship to the property both before and during the marriage even though the property did not appreciate significantly during the marriage itself.

47. The Ahilama Road property, which includes a pre-existing home renovated pre-DOM, and an arena, barn and garage built between 1987 and 1989 (See Findings 23 and 30 hereinabove) has at various times been transferred from [Ernest] to RJR and back to [Ernest] to facilitate loans. At DOCOEPOT, RJR owned Ahilama. The Court finds the DOCOEPOT fair market value of Ahilama to be $1,460,000. Mr. Lau's appraisal and testimony were generally more convincing than those of Mr. Brown. However, the Court did reduce Mr. Lau's value of $1,700,000 by $240,000—$200,000 for his excess valuation of the arena and barn ($300,000 instead of $500,000 as he was unaware that these structures were erected from kits) and $40,000 in that Mr. Lau erred in regard to the number of acres of useable land. Mr. Brown is both a neighbor and a business associate of [Ernest]. Moreover, Mr. Brown himself had appraised this property in 1989 at a fair market value of $1,295,000. There was no evidence that the market

generally, or this property in particular, had depreciated between 1989 and DOCOEPOT.

48. RJR's assets at DOM and DOCOEPOT are as shown on page 6 of Chart I. However, at the December 27, 1991 Rule 60(b) motion hearing, the Court amended the *net* market values ("NMV") to reflect that [the] Ahilama [property] has an outstanding mortgage loan in the amount of $475,720. This reduced its DOCOEPOT NMV to $737,280 and its category 2 portion of NMV to $331,430.... Based upon the facts in Findings 23, 26, 27, 29 and 30, the Court finds it fair to deviate from USP in regard to the Ahilama [property] category 2 portion of NMV by awarding [Rebecca] 30%.

*ASSETS OWNED INDIVIDUALLY:*

*Wailuku Park Square/Mauna Kea/Houston:*

49. In 1989, [Ernest] and one De Coite purchased three acres in Wailuku, Maui to develop an office and warehouse building. The property was sold in May 1990 prior to development. [Ernest's] share of net proceeds was $1,014,290. [Ernest] owed Hart approximately $500,000 for excess draws from JHA in prior years.

50. On June 29, 1990 [Ernest] and Hart purchased 808 acres on the [Hmkua] coast of the Big Island referred to as the "Mauna Kea land" together with an option for 9,642 additional acres. The purchase price was $3,500,000. The seller retained an option to repurchase. [Ernest] and Hart borrowed $3,000,000 from First Hawaiian Credit Corp. ("FHCC"). FHCC held back $300,000 as a reserve for monthly interest payments. [Ernest] and Hart lent the seller $200,000. Thus, total cost was approximately $3,700,000 with $2,700,000 funded by FHCC. [Ernest] used the proceeds from the Wailuku Square sale to fund his and Hart's share of approximately $500,000 each as he owed Hart $500,000 from prior excess draws from JHA.

51. In February 1991 the seller reacquired the land for $4,938,471. Net proceeds to [Ernest] and Hart were $1,942,041 of which [Ernest] was entitled to 50%.

52. [Ernest] and Hart each invested their share of proceeds from Mauna Kea into a commercial property in Houston, Texas. [Ernest's] and Hart's 30% interest in the Houston property was worth $1,850,000 at DOCOEPOT. Thus, [Ernest's] interest in this asset is $925,000. Since all these transactions occurred between DOM and DOCOEPOT, the Houston interest is a category 5 value. However, since much of this transaction occurred after separation, since [Rebecca] made no active contributions, financially or otherwise and since the funds invested during the marriage originated generally from the building of [Ernest's] net worth prior to DOM, the Court deviated from USP by awarding [Rebecca] only 10% of the value of this asset, a sum of $92,500. It is a further relevant factor that the parties always maintained assets in separate names and handled their income separately. See *Au–Hoy v. Au–Hoy*, 60 Haw. 354 [590 P.2d 80] (1979). The Court believes, that to have awarded [Rebecca] a USP value of $462,500 would have constituted an unjustified windfall to her in view of the timing and circumstances of this transaction and the nature of the parties' financial relationship even during the marriage.

*Halawa Center* (page 8 of Chart I):

53. In addition to the three parcels purchased and sold by H.C. II Associates, [Ernest] and Hart, as "Halawa Center Partnership", purchased ten lots in the Halawa Business Park in 1989. They have constructed a commercial property on this multi-lot parcel known as "Halawa Center". There have been delays in construction and at DOCOEPOT occupancy was anticipated to commence within several months. The property's appraised fair market value was $25,000,000. The net value after repayment of loans and construction expenses is $1,574,644. [Ernest's] 50% interest is worth $787,322 and is a category 5 asset. For the same reasons stated in Finding 52 above, the Court

has deviated from USP and has awarded [Rebecca] $78,732, rather than $393,661 of the value of this asset.

*Stockton, California real estate* (page 9 of Chart I):

54. [Ernest] owns a one acre parcel in Stockton, California which was worth $13,000 at DOM and $30,000 at DOCOEPOT. The Court finds no reasons to deviate from category 1 and 2 USP's.

55. At DOCOEPOT, [Ernest] also owns a 5/6 interest in a 53.12 acre parcel of unimproved agricultural land on Thornton Road in Stockton. [Ernest] had acquired a 1/6 interest in 1977. Between July and December, 1984, [Ernest] acquired an additional 3/6 for a total of 4/6 at DOM. The DOM value of [Ernest's] 4/6 interest was 4/6 of $1,595,000, or $1,063,333. The Court awards [Ernest] all of his 100% USP value in this 4/6.

56. In July 1990, [Ernest] acquired another 1/6 interest from co-owner and friend, Dr. Miccio for $485,000. The total DOCOEPOT value of the property is $2,390,000, of which [Ernest] owns 5/6, or $1,991,666. Of this sum, $1,063,333 represents [Ernest's] category 1 USP. $530,000 represents the appreciation in the 4/6 between DOM and DOCOEPOT and is a category 2 value. The Court finds no reasons to deviate from the category 1 and 2 USP's. The remaining 1/6 interest, worth $398,333 and acquired during the marriage is category 5. [Ernest] also owed Miccio $264,436, a category 5 debt. In regard to the category 5 positive and negative values, the Court finds, for the same reasons stated in Finding 52 that it is fair to deviate from USP and award [Rebecca] only 25%. Thus [Rebecca] gets a credit on her side of $99,583 and a debit of $66,109. See page 9 of Chart 1 for the Court's computations regarding the Stockton properties.

*Other:*

* * *

58a. *J & H Helicopters, Inc.:* [Ernest] and Hart formed this corporation in July 1990 to purchase a helicopter. [Ernest's] 50% interest was worth $47,736 at DOCOEPOT. There are no reasons to deviate from category 5 USP allocation.

59. *Net Operating Loss:* Reference was made in testimony to a net operating loss which existed at DOM and to write-off of an old litigation expense related to the MGM lawsuit. The Court finds these to be tax computations which may result in economic benefit. However, they are not assets subject to division within the meaning of HRS Section 580–47 as they do not have a fair market value. *Antolik v. Harvey,* 7 Haw.App. 313 [761 P.2d 305] (1988).

60. *Miscellaneous:* All other assets of [Ernest] and [Rebecca] owned at DOCOEPOT are listed on page 9 and 10 of Chart I. The only deviation from starting point found fair by the Court was in regard to [Ernest's] Liberty Bank stock for reasons similar to those found in Finding 52.[3]

* * *

64. The Court did not find minority and lack of marketability discounts to be relevant to the assets in this case. The only asset in which the interest held is clearly a minority is the Wahiawa [Wahiawā] property owned by Construction (Finding 37). No evidence was presented of any difficulties between the owners. In any event application of a discount as to this property would have a minimal effect on the total marital estate.

65. [Ernest] has not paid personal income taxes at any time during the marriage. Thus, a discount for future tax consequences of property division, and the amount thereof, would be based on speculation and is inappropriate. *Gardner v. Gardner,* [8 Haw.App. 461, 810 P.2d 239] (ICA, April 24, 1991). At the December 27, 1991 hearing, the Court modified its prior total denial of a request for consideration of tax consequences and found it to

---

**3.** The Liberty Bank stock had a Category 5 NMV of $132,500 which the family court awarded 75% to Ernest and 25% to Rebecca.

be fair to allocate to [Rebecca] 50% of personal income tax actually paid by [Ernest] in the future which could be directly related to the sale of assets required to generate funds for the property equalization payment ordered by the Court. The Court also deemed it appropriate that funds be retained in escrow from the equalization payment until 90 days after the relevant tax returns have been filed.

66. Based upon all of the above, the Court found the total net value of the marital estate to be $7,696,759.[4] The Court further found that the USP result would be $5,512,707 to [Ernest] and $2,064,051 to [Rebecca].[5] (See page 11 of Chart I, columns 3, 5 and 6.) The Court's awarded value deviations resulted in a proposed award of $6,476,386 to [Ernest] and $1,225,749 to [Rebecca] (columns 8 and 9, page 11).

\* \* \*

68. At the December 27th hearing on [Ernest's] Motion for Relief under HFCR 60(b) filed December 24, 1991, the Court made adjustments described in Findings 36 and 48 hereinabove. As the BOH debt was reduced from a total of $1,715,043 (categories 1 and 2) to a category 1 only $1,100,000,[6] [Rebecca] must be credited with $94,787, the negative category 2 amount previously deducted from her award (page 1 of Chart I). On the other hand, her 30% of the category 2 value of [the] Ahilama [property] (page 6 of Chart I) is reduced by the amount of $142,716—30% of the $475,720 mortgage omitted from consideration in the Court's earlier decision. The net effect is that [Rebecca's] award is reduced by the sum of $47,929. Additional arithmetic corrections agreed to by counsel result in a total equalization payment as stated in the Divorce Decree filed herein on March 13, 1992 in the amount of $1,127,071.

69. A check on the equitability of the detailed USP award is as follows: The net value of 100% of the marital estate is approximately $8,000,000 ($7,696,759 plus reduction of BOH debt less increase in [the] Ahilama [property] debt). [Rebecca's] USP would be $2,064,051 or a little over 25% of the total. The Court's award to [Rebecca] of $1,160,171 (assets of $33,100 plus the $1,127,071 equalization payment) is approximately 14.5% of the total estate. Given the length of the marriage, the nature of the premarital relationship and all of the circumstances described hereinabove as they are required to be considered by the Court pursuant to HRS Section 580–47, and also giving consideration to the fact that [Ernest] has an unquantified but probable liability in regard to the Ewa ['Ewa] landfill (discussed in Finding 41), the Court deems the reduction from USP to be an equitable result.

70. [Ernest's] statement to Liberty Bank of his net worth on March 31, 1990 was $16,785,494. His balance sheet of

---

4. Our addition showed the following totals:

| | |
|---|---|
| Category 1 | — $1,763,006 |
| Category 2 | — $3,798,590 |
| Category 5 | — $2,135,164 |
| Total | — $7,696,760 |

5. The Partnership Model awards $4,729,883 to Ernest and $2,966,877 to Rebecca.

6. This debt reduction results in the following totals:

| | |
|---|---|
| Category 1 | — $1,998,900 |
| Category 2 | — $4,177,739 |
| Category 5 | — $2,135,164 |
| Total | — $8,311,803 |

The Partnership Model division awards $5,155,351.50 to Ernest and $3,156,451.50 to Rebecca. Rebecca's share increased by $189,574.50 and Ernest's share increased by $425,468.50.

March 31, 1987 [Exhibit 8P(1) ] showed his DOM net worth to be $5,083,010. [Ernest's] statement to Family Court of his net worth in 1985 was negative. If the Court took a simple view, the Court could find that $5,083,010 is [Ernest's] category 1, that $11,702,484 ($16,785,494 less $5,083,010) is category 2, and that [Rebecca's] 25% USP entitlement to the marital gain would be $2,925,621—or the Court could deem the entire estate to be category 2 given the purported 1985 worth. The Court believes that, in view of the totality of circumstances in this complex case, and particularly in view of [Ernest's] varying reports of his net worth, the more detailed approach used hereinabove provides a fairer result. The growth of the estate during the short marriage was due in significant part to [Ernest's] capital, business relationships and reputation established prior to the marriage, and while [Rebecca] assisted [Ernest] as a wife during the marital years and to some extent prior thereto, especially as to the two RJR properties, a $1,127,071 share of the profits of this marital partnership appears fair to the Court—whether computed by a USP approach—detailed as in Chart I or as otherwise summarized in Finding 69 or this paragraph—or pursuant to consideration of HRS section 580–47 factors without consideration of USP's.

71. [Ernest] needs time to liquidate assets to pay [Rebecca] the sum due to her. The Court originally gave him six months (from November 1, 1991), and then, in view of his subsequent arrangement with BOH, on December 27, 1991, extended the time to October 31, 1992. However, [Rebecca] needs a reasonable amount to allow herself to resettle and particularly to obtain housing. Therefore the Court ordered [Ernest] to pay $100,000 of the total sum due by December 31, 1991. [Ernest's] extensive and frequent financial transactions indicate an ability to raise such capital within that time frame.

\* \* \*

73. Once [Rebecca] receives the total equalization payment she will not have a need for alimony. Until that time [Rebecca] has a need, and [Ernest] has the ability to pay, transitional alimony. [Rebecca] has not worked during the marriage and the parties lived at a high standard during the marriage and prior thereto. Until [Rebecca] receives the $100,000 payment she should have $5,000 per month to meet her needs—reasonable for these parties as their life style has been described hereinabove. Following receipt of the $100,000 she will have somewhat less need and should receive $4,000 per month until the final payment.

(Footnotes added.)

### REBECCA'S POINTS ON APPEAL
#### Point Nos. 1 and 2

Referring to the mortgage mentioned in FOF No. 48, Rebecca contends that the family court erred by considering the written representations of Ernest's counsel that a Liberty Bank mortgage encumbered the Ahilama property. We agree with Ernest that FOF No. 48 is supported by substantial evidence in the record.

#### Point No. 3

When the family court decided this case, the Uniform Starting Points (the USPs) for dividing the NMVs at the DOCOEPOT were applicable, *Hatayama v. Hatayama,* 9 Haw.App. 1, 818 P.2d 277 (1991), the USP for dividing Category 2 NMVs was 75% to the party-owner and 25% to the party-non-owner,[7] and the USP for dividing Category 5 NMVs was 50% to each party. *Hashimoto v.*

7. In *Hashimoto v. Hashimoto,* 6 Haw.App. 424, 427, 725 P.2d 520, 523 (1986), we recognized the Hawai'i Supreme Court's decision in *Cassiday v. Cassiday,* 68 Haw. 383, 389, 716 P.2d 1133, 1138 (1986), which held, the family court may award up to half of the appreciation of Category 2 and 4 NMVs to the nonowning spouse if, under the totality of the circumstances, it is just and equitable to do so. This limitation remains in effect to this day.

*Hashimoto,* 6 Haw.App. 424, 427–28, 725 P.2d 520, 523 (1986). Thus, the family court proceeded under the notion that, assuming all valid and relevant considerations are equal, Category 2 NMVs are divided 75% to the owner and 25% to the non-owner. It started at the USP and, with respect to some properties but not others, decided that the relevant facts authorized and warranted a deviation from the USP in favor of Ernest. In this appeal, Rebecca contends that the family court abused its discretion when it awarded Rebecca less than 25% of certain Category 2 NMVs and less than 50% of certain Category 5 NMVs.

After the Divorce Decree was entered, *Gussin v. Gussin,* 73 Haw. 470, 836 P.2d 484 (1992), invalidated the USPs, and *Tougas v. Tougas,* 76 Hawai'i 19, 868 P.2d 437 (1994), decided that the Partnership Model was applicable. We apply the Partnership Model in this case because

[a]s a general principle, "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). *United States v. Fresno Unified School District,* 592 F.2d 1088, 1093 (9th Cir.1979). A court's considerations "relative to the possible working of an injustice center upon (a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." 416 U.S. at 717, 94 S.Ct. at 2019.

*United States v. County of Hawaii,* 473 F.Supp. 261, 264–65 (1979).

"When there is a change in the law by court decision between the time of the trial court ruling and the time of appeal, the appellate court applies the law prevailing at the time of the appellate disposition."

*Bischofshausen v. Pinal–Gila Counties Air Quality Control District,* 138 Ariz. 109, 110, 673 P.2d 307, 308 (1983).

*Bank of Hawaii v. Davis Radio Sales & Service,* 6 Haw.App. 469, 477, 727 P.2d 419, 425 (1986).

Under the Partnership Model, assuming all valid and relevant considerations are equal,

1. The Category 1 and 3 NMVs are the "partner's contributions" to the Marital Partnership Property that, assuming all valid and relevant considerations are equal, are repaid to the contributing spouse; and

2. The Category 2, 4, and 5 NMVs are Marital Partnership Property that, assuming all valid and relevant considerations are equal, are awarded one-half to each spouse.

*Hussey v. Hussey,* 77 Hawai'i 202, 207–08, 881 P.2d 1270, 1275–76 (App.1994). We label this *Hussey* division the Partnership Model Division.

Thus, under the Partnership Model Division, Category 2, 4, and 5 NMVs are divided 50% to the owner and 50% to the nonowner. *Id.*

The Partnership Model requires the family court, when deciding the division and distribution of the Marital Partnership Property[8] of the parties part of divorce cases, to proceed as follows: (1) find the relevant facts; start at the Partnership Model Division and (2)(a) decide whether or not the facts present any valid and relevant considerations authorizing a deviation from the Partnership Model Division and, if so, (b) itemize those considerations; if the answer to question (2)(a) is "yes," exercise its discretion and (3) decide whether or not there will be a deviation; and, if the answer to question (3) is "yes," exercise its discretion and (4) decide the extent of the deviation.

Question (2)(a) is a question of law. The family court's answer to it is reviewed

---

8. In *Hussey v. Hussey,* 77 Hawai'i 202, 206–07, 881 P.2d 1270, 1274–75 (App.1994), we distinguished between Premarital Separate Property, Marital Separate Property, and Marital Partnership Property.

under the right/wrong standard of appellate review. Questions (3) and (4) are discretionary matters. The family court's answers to them are reviewed under the abuse of discretion standard of appellate review.

■ Ernest contends that when the family court decided to deviate, it properly considered the facts that: (A) much of the Category 2 and 5 NMVs occurred after the parties separated; (B) much of the Category 2 and 5 NMVs were the result of Ernest's skill and effort; (C) Ernest's premarital Category 1 property was the basis of some of the Category 2 and/or 5 NMVs; and (D) throughout the relationship the parties maintained entirely separate estates and maintained their own separate incomes and expenses.

Ernest further contends that the family court properly may have also considered: (E) the shortness of the marriage; (F) the unhappy character of the marriage; and (G) the fact that Ernest will receive appreciated capital assets and other "tax sensitive" assets.

We add that the family court also considered: (H) Rebecca's premarital contribution to the improvement of Ernest's Category 1 property (FOF 48) and (I) the lack of Rebecca's active contribution, financially or otherwise, to Category 5 property (FOF 52).

We now examine whether reasons (A) through (I) are valid considerations authorizing the family court to deviate from the Partnership Model Division. On the subject of valid considerations and invalid considerations, we have stated that:

> In determining whether one or more valid and relevant considerations authorize the family court to deviate from the Partnership Model, the family "court shall take into consideration: the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, and all other circumstances of the case." HRS § 580-47(a) (1993). Other than relative circumstances of the parties when they entered

into the marital partnership and possible exceptional situations, the above quoted part of HRS § 580-47(a) requires the family court to focus on the present and the future, not the past.

\* \* \*

To the extent, if any, that *Richards [v. Richards,* 44 Haw. 491, 355 P.2d 188 (1960),] requires the nonowner marital partner to prove that he or she contributed to the accumulation of the Category 2 and Category 5 NMVs of the other marital partner's Marital Partnership Property before he or she has a meritorious claim to an equitable share of it, *Richards* has been superseded by the Partnership Model.

The following principle enunciated by this court in *Gussin v. Gussin,* 9 Haw.App. 279, 288–89, 836 P.2d 498, 504–05 (1991), *rev'd,* 73 Haw. 470, 836 P.2d 484, (1992), remains valid. Marital partner A's during-the-marriage management and maintenance of marital partner A's premarital investment properties are marital partnership activities. Marital partner B's during-the-marriage noninvolvement in the management and maintenance of marital partner A's premarital investment property is no more a relevant and valid factual consideration for reducing marital partner B's Partnership Model share than marital partner B's preparing all of marital partner A's meals or doing all of the housework are relevant and valid factual consideration for increasing marital partner B's Partnership Model share.

"[M]arital partnerships are equal partnerships. During a marriage, both partners enjoy the consequences of one partner's successes and both partners suffer the consequences of one partner's failures." *Hatayama v. Hatayama,* 9 Haw. App. 1, 12, 818 P.2d 277, 283 (1991).

\* \* \*

Under general partnership law, "each partner is entitled to be repaid his [or her]

contributions to the partnership property, whether made by way of capital or advances." 59A Am.Jur.2d *Partnership* § 476 (1987) (footnotes omitted). Absent a legally permissible and binding partnership agreement to the contrary, "partners share equally in the profits of their partnership, even though they may have contributed unequally to capital or services." *Id.* § 469 (footnotes omitted).... [Hawai'i] partnership law provides in relevant part as follows:

> **Rules determining rights and duties of partners.** The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them by the following rules:
>
> (a) Each partner shall be repaid the partner's contributions, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to the partner's share of the profits.

*Gardner v. Gardner,* 8 Haw.App. 461, 464, 810 P.2d 239, 242 (1991) (quoting HRS § 425–118(a) (1985)) (quoted in *Tougas v. Tougas,* 76 Hawai'i 19, 27–28, 868 P.2d 437, 445–446 (1994)).

*Epp v. Epp,* 80 Hawai'i 79, 89, 91–92, 905 P.2d 54, 64, 66–67 (App.1995) (first and fifth alterations added).

Since the family court's considerations (B), (C), (D), (E), (F), (H), and (I) violate partnership policies, principles and rules, they are not valid considerations that authorize a deviation from the Partnership Model Division. Consideration (F) also violates the policy in favor of no-fault divorces.

■ With respect to consideration (G), we conclude that if the sale of a Marital Partnership Property is not explicitly or implicitly ordered or enforceably promised, the family court is not allowed to consider the tax ramifications of that sale. On the other hand, if the sale of Marital Partnership Property is explicitly or implicitly ordered or enforceably promised, the family court must consider the tax ramifications of the sale.[9] In this case, FOF No. 71 shows that Ernest was implicitly ordered to sell Marital Partnership Property.

■ Consideration (A) above has been the subject of Hawai'i appellate opinions. At the time of *Woodworth v. Woodworth,* 7 Haw. App. 11, 740 P.2d 36 (1987), the valuation date for Category 2, 4, and 5 NMVs was the DOFSICOD. In *Woodworth,* we established a Category 6 NMV covering "[t]he difference between the NMVs, plus or minus, of all property owned by one or both of the spouses at the conclusion of the evidentiary part of the trial [the DOCOEPOT] and the total of the NMVs, plus or minus, includable in Categories 1, 2, 3, 4, and 5." In other words, Category 6 covered the difference in the NMVs, plus and minus, between the DOFSICOD and the DOCOEPOT. In *Myers v. Myers,* 70 Haw. 143, 764 P.2d 1237 (1988), however, the Hawai'i Supreme Court abolished Category 6 and emphatically stated in relevant part as follows:

> Our divorce and separation laws do "not contemplate any [final] division of property other than where the person is divorced **a vinculo [matrimonii]**." *Clifford v. Clifford,* 42 Haw. 279, 283 (1958).... A presumption that the non-owning spouse is not entitled to any part of the appreciation in property legally owned by the other after a declaration by either that the marriage has ended is inconsistent with the partnership model of marriage we have accepted and the rule that a final division of marital property can be decreed only when the partnership is dissolved.

70 Haw. at 154, 764 P.2d at 1244 (brackets in original).

---

**9.** If a property is awarded to the husband and he is explicitly or implicitly ordered to sell it and pay the wife one-half of the net before taxes, the distribution is not 50–50 because the wife receives 50% and the husband receives 50%, less the taxes.

Since there is no Category 6, the valuation date for Categories 2, 4, and 5 is the DOCOEPOT rather than the DOFSICOD, and all appreciation/depreciation of Marital Partnership Property that occurs between the DOM and the DOCOEPOT is a Category 2, 4, and/or 5 NMV. Assuming all valid and relevant considerations are equal, the Partnership Model Division awards each party 50% of all Category 2, 4, and 5 NMVs. Since the marital partnership continues until the DOCOEPOT, it follows that one party's post-DOFSICOD, pre-DOCOEPOT activity contributing to the increase of a Category 2, 4, and/or 5 NMV is a marital partnership activity that cannot be used to justify the award of more than 50% to the contributing party and less than 50% to the non-contributing party. Therefore, we conclude that consideration (A) is not a valid consideration authorizing a deviation from the Partnership Model Division.

### Point No. 4

 Referring to FOF No. 47, Rebecca contends that the family court erred when it considered the fact that her appraiser, George Lau (Lau), did not know that the arena and barn were constructed from kits as a basis for deciding that Lau's appraisal of the Ahilama property was $200,000 too high. We disagree. Lau valued the Ahilama property and decided that the DOCOEPOT NMV of the land was $770,000, the NMV of the arena and barn was $500,000, and the NMV of the entire property was $1,700,000. Appraiser Alan Brown (Brown) decided that the NMV of the land was $650,000 and the NMV of the arena and barn was $300,000. FOF No. 47's finding that the NMV of the arena and barn was $300,000 is not clearly erroneous.

### Point No. 5

As noted in FOF No. 48, the family court awarded Rebecca less than a 50% Partnership Model Division share of the NMV of the marital home at Ahilama Road. Rebecca contends that in light of the labor, toil, and vision which she put into the Ahilama property, the family court abused its discretion when it failed to give proper weight to her activities that contributed to the increase in the NMV of Ernest's Ahilama property during the marriage. Ernest responds that the considerations justifying an award to Rebecca of less than 50% of Ernest's other separately held assets apply here. We disagree with both Rebecca and Ernest. As we noted in our response to Rebecca's Point No. 3, the considerations cited by Rebecca and Ernest are not valid and relevant considerations for deviating from the Partnership Model Division.

### ERNEST'S POINTS ON APPEAL

#### A.

Ernest contends that the family court erred in the valuation of various specified assets and liabilities both at the DOM and the DOCOEPOT. The record shows that, notwithstanding evidence of various assets and liabilities and their NMVs, the family court did not enter any findings with respect to this evidence. On remand, the family court must remedy this deficiency.

#### B.

 Ernest contends that the family court abused its discretion when it failed to give Ernest appropriate credit for the Category 1 NMVs of various property.[10] We agree in part.

The NMV, plus or minus, of all Marital Partnership Property separately owned by one spouse on the DOM but excluding the NMV attributable to Marital Partnership Property that is subsequently legally gifted

---

10. In his Opening Brief, Ernest alleges that

Unfortunately, ever since the Intermediate Court of Appeals decided *Woodworth v. Woodworth*, [7 Haw.App. 11, 740 P.2d 36 (1987), *overruled in part*, *Myers v. Myers*, 70 Haw. 143, 764 P.2d 1237 (1988)] the Family Court, in

what has seemed to be almost a matter of unspoken policy, has consistently failed to give parties any Category 1 credit for assets which existed at DOM and no longer existed at DOCOEPOT.

by the owner to the other spouse, to both spouses, or to a third party, is a Category 1 NMV. The increase in the NMV of all Marital Partnership Property whose NMV on the DOM is included in Category 1 and that the owner separately owns continuously from the DOM to the DOCOEPOT is a Category 2 NMV. The difference between the NMVs, plus or minus, of all Marital Partnership Property owned by one or both of the spouses on the DOCOEPOT minus the NMVs, plus or minus, includable in Categories 1, 2, 3, and 4, is a Category 5 NMV.

Thus, if a party continues to own a Category 1 property at the DOCOEPOT and the DOCOEPOT NMV of that property is more than its Category 1 NMV, the excess at DOCOEPOT is a Category 2 NMV. If a party does not own the Category 1 property at the DOCOEPOT, that Category 1 NMV is a part of the total of the DOCOEPOT NMVs and is subtracted from the Category 5 NMVs.

Ernest presented evidence of the NMVs of property owned at the DOM but not owned at the DOCOEPOT. The family court entered findings with respect to the existence and NMVs of some of these Category 1 properties but not with respect to others. On remand, the family court must remedy this deficiency.

For example, although the Haiku Estates Phase I referred to in FOF No. 38 clearly had a Category 1 NMV, and there is evidence that its Category 1 NMV was $567,301, the family court's Chart I does not list any DOM NMV for Haiku Estates Phase I.

■ In contrast, another of the Category 1 NMVs challenged by Ernest is the tax loss carry forward (TLCF) mentioned in FOF No. 59. Ernest alleges that this TLCF saved the parties $400,000 in taxes. Based on the record, however, the following statement in FOF No. 59 is not clearly erroneous: "[although] these [are] tax computations which may result in economic benefit[,] ... they are not assets subject to division within the meaning of HRS Section 580–47 as they do not have a fair market value. *Antolik v. Harvey*, 7 Haw.App. 313, [761 P.2d 305] (1988)."

## C.

Referring to FOF No. 41, Ernest contends that the family court erred when it decided that the so-called "Ewa ['Ewa] Landfill" did not have a positive NMV on the DOM and did not have a negative NMV on the DOCOEPOT.

■ With respect to the DOM NMV, Ernest presented expert evidence that the DOM NMV of the profits received during the marriage from the operation of the 'Ewa Landfill was $400,000. However, the relevant NMV was the DOM NMV of the 'Ewa land lease. We agree with the family court that Ernest presented insufficient evidence to prove the DOM NMV of the 'Ewa land lease. In the absence of sufficient evidence, the DOM NMV of the 'Ewa land lease is zero.

■ With respect to the 'Ewa Landfill being a liability at the DOCOEPOT, the record shows that, in a February 21, 1989 Notice of Order, the Director of Land Utilization, City and County of Honolulu, notified Jackson Construction, Ltd., (Construction) that its waste disposal operations were unlawful, fined it $50, ordered it "to cease and desist from the violation; correct the violation at [its] own expense and pay [the] civil fine on or before" March 23, 1989, and notified it that if corrective action was not completed by that date, "a daily fine of $50.00 will be assessed until corrective action is completed." The specifics of the required "corrective action" were not stated.

On September 13, 1990 the Zoning Board of Appeals, City and County of Honolulu, State of Hawai'i, entered Findings of Fact, Conclusions of Law and Decision and Order which affirmed the decision of the Director of the Department of Land Utilization that Construction was in violation of Section 5.20–5 of the Land Use Ordinance by "engaging in

waste disposal and processing activity on ... [p]roperty which has an agricultural State land use district classification and is county zoned Restricted Agricultural AG–1." On March 11, 1992 in Civil No. 90–3265, the circuit court affirmed the September 13, 1990 decision of the Zoning Board of Appeals. We take judicial notice that the circuit court's decision was not appealed.

Ernest presented evidence that it would cost $4,215,000 "to remove approximately 179,800 cy [cubic yards] of fill material from the subject property[.]" However, the record permitted the family court to find that Ernest failed to prove that Construction would actually be required to suffer that expense. Similarly, the record permitted the family court to find that Ernest failed to prove that Construction would actually be required to suffer any financial penalty from the 'Ewa Landfill. Under the circumstances, the best Ernest could reasonably hope for was an order requiring Rebecca to reimburse Construction an equitable percentage of any such expense or penalty Construction or Ernest actually paid. If any such payments have been made or will be made, Ernest may seek appropriate reconsideration on remand.

### D.

▉ Ernest contends that the "family court erred when it failed to fully consider the tax consequences and other immediate and specific costs associated with the distribution of assets and liabilities incident to the ... divorce." We agree that, although the family court considered the tax consequences, it failed to adequately consider them.

Although the family court valued and awarded Marital Partnership Property, much of the Marital Partnership Property awarded was owned by corporations owned by Ernest. The record explicitly states that RJR is a Subchapter S corporation. FOF No. 71 implicitly ordered Ernest to cause his corpora-

tions to sell some of that Marital Partnership Property to generate the funds to pay Rebecca. As we noted in our response to Rebecca's Point No. 3 above, in such situations the family court must consider the tax ramifications of the sale.

The Divorce Decree allowed Ernest "the option of causing said equalization to [Rebecca] by giving [Rebecca] shares in any of [Ernest's] corporations which the corporations will redeem for the dollar amount awarded to [Rebecca] by the stated deadline." However, it is probable that the corporations must sell property to generate the funds to redeem the shares.

As noted in FOF No. 65, the family court allocated to Rebecca "50% of personal income taxes actually paid by [Ernest] ... which could be directly related to the sale of assets required to generate funds for the property equalization payment ordered by the Court."[11] However, the family court did not allocate to Rebecca any liability for the percentage of the income taxes actually paid by the corporation which could be directly related to the sale of assets.

### E.

▉ Referring to FOF No. 20, Ernest contends that the family court erred when it failed to enforce Rebecca's promise that she would make no claim against Ernest's property. We disagree.

If there is a valid and enforceable premarital agreement, it must be enforced. *Epp v. Epp*, 80 Hawai'i at 88, 905 P.2d at 63. However, there is no evidence of a valid and enforceable premarital agreement. The first sentence of FOF No. 26 is right.

▉ "The material elements of equitable estoppel require one person to wilfully cause another person to erroneously believe a certain state of things and the other person to reasonably rely on his or her erroneous belief

---

11. In situations where Rebecca is awarded less than 50% of the NMV of a property and the property is sold to generate the funds to pay her, it is not equitable to require her to pay 50% of the tax directly related to the sale.

to his or her detriment." *Aehegma v. Aehegma*, 8 Haw.App. 215, 223, 797 P.2d 74, 80 (1990). We conclude that, assuming Ernest erroneously believed, Ernest did not reasonably rely on his erroneous belief.

## CONCLUSION

Accordingly, we vacate the property division part of the family court's March 13, 1992 Divorce Decree and affirm the family court's April 6, 1992 Order Granting Motion and Affidavit for Relief After Order or Decree. Further hearings are not required or prohibited. We remand for the family court's reconsideration, in the light of this opinion, of the findings of fact and conclusions of law, and the division and distribution of the Marital Partnership Property of the parties.