**VIRGINIA GAIL MYERS**, Petitioner–Appellant, v. **JACK EUGENE MYERS**, Respondent–Appellee

NO. 12380

(FC–D NO. 134828)

NOVEMBER 25, 1988

LUM, C.J., NAKAMURA, HAYASHI, AND
WAKATSUKI, JJ., AND CIRCUIT JUDGE CHUN,
IN PLACE OF PADGETT, J., RECUSED

144

## OPINION OF THE COURT BY NAKAMURA, J.

The Family Court of the First Circuit awarded Virginia Gail Myers a decree of divorce from Jack Eugene Myers on May 8, 1987; the decree also divided and distributed the estate of the parties. Mrs. Myers appealed, averring the family court "erred in its distribution of the property of the parties[.]" The Intermediate Court of Appeals agreed that the family court abused its discretion in determining the value of her husband's pension plan but affirmed the property division in all other respects. We granted her application for certiorari because other aspects of the family court's final division and distribution of the estate of the parties did not appear to be just and equitable, as mandated by HRS § 580–47. A review of the record confirms that the family court's treatment of the post–separa-. ration appreciation of property acquired with marital assets but held in the husband's name, following a rule enunciated by the Intermediate Court of Appeals in *Woodworth v. Woodworth*, 7 Haw. App. ____, 740 P.2d 36 (1987), is inconsistent with HRS § 580–47. We therefore overrule *Woodworth v. Woodworth* as precedent to the extent it is inconsistent with this opinion, vacate the portions of the decree covering the Kaiser Option and the Revere Copper investment, and remand the case for further proceedings not inconsistent with this opinion.

### I.

### A.

The parties were married on December 12, 1969, physically separated on June 19, 1984, and divorced on May 8, 1987. No children were born of the marriage. The record on appeal indicates the parties discussed divorce and its legal consequences on numerous occasions prior to their separation.

In December of 1982, they reached an agreement whereby Mrs. Myers was to receive one–third of the marital assets and Mr. Myers was to receive the remaining two–thirds and be responsible for liabilities other than the first mortgage on the marital residence, which Mrs. Myers was to receive. The oral agreement was refined and reduced to writing thereafter by the lawyers retained by the parties, and the Agreement in Contempla-

tion of Divorce was executed on October 11, 1983.[1]   In accord with its terms, Mr. Myers then conveyed his interest in the marital residence to Mrs. Myers and removed the encumbrance of the second mortgage on the property; he also made a lump sum payment of $1,008,222.00 to Mrs. Myers.

Mrs. Myers filed her complaint for divorce on July 24, 1984. Though the parties initially contemplated that there would be no contest of the action, Mr. Myers filed his Cross–Complaint for Divorce on March 7, 1985.  And when the case was finally heard in October of 1986, a primary dispute to be resolved by the family court was the validity and effect of the Agreement in Contemplation of Divorce.  The court concluded the agreement was valid; it nevertheless "refuse[d] to allow the Agreement to control the division and distribution of the parties' assets."

For purposes of valuing the assets subject to division, "in view of the fact that almost all of the financial documents that were offered into evidence [were dated] June 30, 1984 . . . , the [c]ourt [concluded] it [was] reasonable [to] use [that date rather than the date of separation, June 19, 1984]."  Among the assets valued and divided by the family court were the husband's interest in an Option Agreement and Right of First Refusal for the purchase of the real property on which the Kaiser Hospital formerly stood (the Kaiser Option) and his interest in a limited partnership holding Revere Copper stock (the Revere Copper investment).

Mr. Myers acquired a 50% interest in the Kaiser Option from Bruce Stark on September 2, 1982 and entered into an agreement to purchase the remaining 50% interest from Stark on January 19, 1984.  Mr. Myers found it necessary thereafter to file suit against Kaiser Hospital to enforce the option to buy its property.  The suit was settled on May 4, 1984, and the validity of the option, as well as the price of the real property, was established.  He commenced his efforts to obtain the necessary governmental approvals and permits to develop the property in October of 1984 and succeeded more than a year later in December of 1985.  He sold the Kaiser Option for approximately $12,000,000.00 in April of 1986.

The interest in the Revere Copper investment was acquired by Mr. Myers in 1983, and the transaction involved an outlay of $725,000.00 on

---

[1]The agreement contained a proviso that it was valid only if a divorce action was filed within a year of the date of execution.

his part. He "had no intention of sharing any portion of this investment with [Mrs. Myers since the acquisition followed the execution of the Agreement in Contemplation of Divorce and] he believed the funds used to purchase the investment were his own separate funds." The family court found the investment was worth $1,380,410.00 as of June 30, 1984.

The court ruled Mrs. Myers was "entitled to one–half (1/2) the value of the [Kaiser] Option as of June 30, 1984[,]" and "one–half (1/2) . . . of the value of the [Revere] stock[]" as of that date. She appealed from "the part of the May 8, 1987 Divorce Decree relating to the division and distribution of property and debts." The appeal was assigned to the Intermediate Court of Appeals for disposition.

### B.

Mrs. Myers sought to overturn the property division on grounds that the family court "improperly valued and apportioned the Kaiser Option and Revere Copper Investment[]" and "erred as a matter of law by concluding that Husband's pension is subject to deferred taxes." The Intermediate Court agreed "that the family court abused its discretion when it reduced the value of Husband's $946,000 pension plan account by $560,000 on account of the taxes that Husband would have been obligated to pay if he had withdrawn the funds in his pension plan account on June 30, 1984." The appellate court, however, found no reason to disturb the valuation and apportionment of the Kaiser Option and the Revere Copper investment, deeming these actions consistent with its decision in *Woodworth v. Woodworth*, 7 Haw. App. ___, 740 P.2d 36 (1987).

### II.

Mrs. Myers now urges us to review and modify the part of the intermediate court's decision in *Woodworth v. Woodworth, supra*, "establishing legal ownership as the uniform starting point for the distribution of post–separation appreciation of assets acquired during marriage by and from the investment of marital assets, labor and capital of the spouses." We begin our review of the case by examining the statute governing the division and distribution of the estate of the parties in a divorce action.

## A.

The statute in question, HRS § 580–47(a), empowers the family court, "[u]pon granting a divorce, . . . [to] make such further orders as shall appear just and equitable . . . finally dividing and distributing the estate of the parties, real, personal, or mixed, whether community, joint, or separate[.]"[2] "There is," we have said in applying the statute, "no fixed rule for determining the amount of property to be awarded each spouse in a divorce action other than as set forth in HRS § 580–47." *Au Hoy v. Au Hoy*, 60 Haw. 354, 357, 590 P.2d 80, 82 (1979). Section 580–47 "gives to the family court the discretion to divide marital property according to what is just and equitable[,]" *Cassiday v. Cassiday*, 68 Haw. 383, 388, 716 P.2d 1133, 1137 (1986) (citation omitted), and this authority "includes the discretion to award separate property to the non–owning spouse." *Id.* at 387, 716 P.2d at 1136 (citations omitted).

When the directive to the court is to do what is just and equitable in the circumstances, "[o]f course, each case must be decided upon its own facts and circumstances." *Carson v. Carson*, 50 Haw. 182, 183, 436 P.2d 7, 9 (1967). This "do[es] not mean that the . . . court may do whatever pleases it. [A grant of discretion] means instead that the court has a range

[2]HRS § 580–47(a), in relevant part, reads:

> **Support orders; division of property.** (a) Upon granting a divorce, or thereafter if, in addition to the powers granted in (c) and (d) of this section, jurisdiction of such matters is reserved under the decree by agreement of both parties or by order of court after finding that good cause exists, the court may make such further orders as shall appear just and equitable (1) compelling the parties or either of them to provide for the support, maintenance, and education of the children of the parties; (2) compelling either party to provide for the support and maintenance of the other party; (3) finally dividing and distributing the estate of the parties, real, personal, or mixed, whether community, joint, or separate; and (4) allocating, as between the parties, the responsibility for the payment of the debts of the parties whether community, joint, or separate, and the attorney's fees, costs, and expenses incurred by each party by reason of the divorce. In making such further orders, the court shall take into consideration: the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, and all other circumstances of the case.

of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." *Kern v. TXO Prod. Corp.*, 738 F.2d 968, 970 (8th Cir. 1984). Thus, we have avoided, where possible, the adoption of general rules governing the division of marital assets.

### B.

In *Cassiday v. Cassiday*, 6 Haw. App. 207, 716 P.2d 1145 (1985), the Intermediate Court of Appeals established a general rule "that it is equitable to award each party half of the during–marriage real appreciation of property separately owned at the time of the marriage or subsequently received through gifts or inheritance and still separately owned at divorce[.]" *Cassiday v. Cassiday*, 68 Haw. at 384, 716 P.2d at 1134. "The effect of such a rule," we said, was "to create a rebuttable presumption that [any appreciation in] separate property should be evenly divided." *Id.* at 388, 716 P.2d at 1137. We therefore rejected the Intermediate Court's general rule and held "instead that the trial court may award up to half of [the during–marriage] appreciation [of separately owned property] to the non–owning spouse if, under the totality of the circumstances, it is just and equitable to do so." *Id.* at 389, 716 P.2d at 1138. "The trial court," we added, "also may determine that a lesser award, or no award, is in order." *Id.*

### III.

The dispute at bar involves an appreciation in the value of separately owned marital property during the lengthy period between the separation of the parties and their divorce, and our concern again is with the establishment by the Intermediate Court of Appeals of rules governing the division of such property.

### A.

Inasmuch as HRS § 580–47(a) empowers the family court to make a "just and equitable" division and distribution of "the estate of the parties, real, personal, or mixed, whether community, joint, or separate[,]" the task of sorting, valuing, and dividing assets indeed may be formidable. In

*Hashimoto v. Hashimoto*, 6 Haw. App. 424, 725 P.2d 520 (1986), the Intermediate Court of Appeals (ICA) classified marital assets subject to division; the classification scheme underscored the complexity of the task. The ICA's five–category classification of property and "property net market values" took the ownership, the time of acquisition, the manner of acquisition, and the during–marriage increase in the value of marital assets into account [3] and designated "uniform starting points" (USP) from which the family court's "equitable distribution analysis and application of statutory and case law mandates[]" should begin. *Id.* at 426, 725 P.2d at 522.[4] "Uniform starting points" were first enunciated by the ICA

---

[3] The ICA's opinion, in relevant part, reads:
Divorce cases involve up to five (5) separate categories of property net market values, as follows:

*Category 1.* The date–of–marriage net market value of all property separately owned at the date of marriage but excluding the value attributable to property that is subsequently legally gifted by the owner to the other party, to both parties, or to a third party.

*Category 2.* The during–the–marriage increase in the net market value of category 1 property that the owner separately owns at the time of the divorce.

*Category 3.* The date–of–acquisition net market value of property separately acquired by gift or inheritance during the marriage but excluding the value attributable to property that is subsequently legally gifted by the owner to the other party, to both parties, or to a third party.

*Category 4.* The during–the–marriage increase in the net market value of category 3 property that the owner separately owns at the time of the divorce.

*Category 5.* The time–of–divorce net market value of all property owned by one or both of the parties at the time of the divorce minus the net market values included in categories 1, 2, 3, and 4.

*Hashimoto v. Hashimoto*, 6 Haw. App. at 425–26, 725 P.2d at 522 (footnotes omitted).

[4] The adoption of "uniform starting points" for the commencement of equitable distribution analysis rather than "general rules" by the ICA was a consequence of our indication in *Cassiday v. Cassiday* that "general rules" serving to diminish the discretion vested in the trial court would not be approved.

The ICA summarized its holdings with respect to "uniform starting points" in the headnotes to *Hashimoto* in these terms:

When deciding how to equitably divide the value of property in a divorce case, the "uniform starting points" are points from which to commence equitable distribution analysis and application of statutory and case law mandates.

in *Miura v. Miura*, No. 10651 (Haw. App. July 30, 1986) (mem.), but we ordered the depublication of the full opinion and set it to naught as precedent on August 22, 1986.[5] *Hashimoto*, however, was not reviewed by this court because no application for further review of the case was filed.

Subsequently, the appellate court observed in *Woodworth v. Woodworth* that a division of the estate of the parties necessitated the determination of ownership and value of property held by either or both spouses on the date of marriage, during marriage, and/or at the time of divorce. 7 Haw. App. at ____, 740 P.2d at 39. It said that for purposes of dividing property owned by either or both spouses at the time of divorce, what is relevant is the "'date of final separation in contemplation of divorce.'" *Id.* at ____, 740 P.2d at 39. This date, the court ruled, is the date when the trial is completed or "when one spouse clearly and unconditionally communi-.

---

. . . .

The uniform starting point for dividing the net market values under categories 1 and 3 is 100% to the owner and 0% to the non-owner.

. . . .

The uniform starting point for dividing the net market values under categories 2 and 4 is 75% to the owner and 25% to the non-owner.

. . . .

The uniform starting point for dividing the net market values under category 5 is 50% to the Husband and 50% to the Wife.

6 Haw. App. at 425, 725 P.2d at 521.

[5] Rule 2 of the Rules of the Intermediate Court of Appeals reads as follows:

RULE 2. PUBLICATION OF OPINIONS OF
INTERMEDIATE COURT OF APPEALS;
CITATION OF OPINION

(a) **Publication of Full Opinions**. A full opinion of the intermediate court of appeals shall be published in a manner authorized by the supreme court. The supreme court, however, may order that a full opinion be changed to a memorandum opinion.

(b) **Citation of Opinions**. A memorandum opinion shall not be cited by a court or by a party in any other action or proceeding except when the opinion establishes the law of the pending case, res judicata or collateral estoppel, or in a criminal action or proceeding involving the same defendant or a disciplinary action or proceeding involving the same respondent.

"Depublication" occurs when the supreme court orders that a full opinion of the ICA be changed to a memorandum opinion, which by virtue of the rule cannot be cited as authority, save in limited situations.

cates to the other . . . that the marriage has in fact ended and that he or she wants a divorce and does not thereafter . . . communicate a different message to the other[, ]" whichever occurs earlier. *Id.* at ____, 740 P.2d at 40.

The court's establishment of the "date of final separation in contemplation of divorce" (DOFSICOD) as the relevant date for determining the value of marital assets at the time of divorce resulted in a reexamination of its prior classification of "property net market values" subject to division and the addition of yet another category of "net market value" (NMV), Category 6, covering "[t]he difference between the NMVs, plus or minus, of all property owned by one or both of the spouses at the conclusion of the evidentiary part of the trial and the total of the NMVs, plus or minus, includable in categories 1, 2, 3, 4, and 5." *Id.* at ____, 740 P.2d at 40.[6] The court then held "[t]he USP for dividing the NMVs under category 6 is to award them to their legal owner spouses in proportion to their

---

[6]The ICA further defined Category 6 in these terms:
  If the DOFSICOD occurs prior to the conclusion of the evidentiary part of the trial, and the NMVs of the properties owned by the spouses at the conclusion of the trial are more or less than the NMVs at the DOFSICOD, then the differences, plus or minus, will be classified as category 6 NMVs.

*Woodworth v. Woodworth*, 7 Haw. App. at ____, 740 P.2d at 40. The court then set forth its revised classification of net market values as follows:
  **Category 1.** The NMV, plus or minus, of all property separately owned by one spouse on the DOM [(date of marriage)] but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.
  **Category 2.** The pre–DOFSICOD increase in the NMV of all property whose NMV on the DOM is included in category 1 and that the owner separately owns continuously from the DOM to the DOFSICOD.
  **Category 3.** The date–of–acquisition NMV, plus or minus, of property separately acquired by one spouse by gift or inheritance during the marriage but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.
  **Category 4.** The pre–DOFSICOD increase in the NMV of all property whose NMV on the date of acquisition during the marriage is included in category 3 and that the owner separately owns continuously from the date of acquisition to the DOFSICOD.
  **Category 5.** The NMV, plus or minus, of all property owned by one or both of the spouses on the DOFSICOD minus the NMVs, plus or minus, includable in categories 1, 2, 3, and 4.

legal ownership." *Id.* at ____, 740 P.2d at 41. In effect, it established a presumption that a legal–owner spouse is entitled to the appreciation in marital assets between the DOFSICOD and the conclusion of the evidentiary part of the trial, a period that could extend, as it did here, for several years. This, in our view, cannot be squared with the mandate of HRS § 580–47 "to look beyond the mere form of title" in dividing the estate of the parties. Kastely, *An Essay in Family Law: Property Division, Alimony, Child Support, and Child Custody,* 6 U. Haw. L. Rev. 381, 393 (1984).

### B.

The family court "found" Mr. Myers was "properly entitled to the appreciation in value of the Kaiser Option after the date of separation" because the project was a "highly speculative venture," it "was largely undeveloped prior to the date of separation," it "did not actually reach fruition until 1986," and his "skill and effort resulted in the development of the Kaiser Option without [the] assistance" of Mrs. Myers. The court's conclusion with respect to the Revere Copper investment was that "the parties [were] entitled to one–half (1/2) each of the value of the stock[]" as of June 30, 1984. Deeming the "difference in the value of the Kaiser Option on June 19, 1984 and on January 27, 1987 . . . a category 6 value," the ICA said "the family court did not abuse its discretion when it decided not to vary its award of this . . . value from the applicable uniform starting point." The ICA further concluded Mrs. Myers "failed to prove" any category 6 increase attributable to the Revere Copper stock.

Granted, "the skill and effort" of Mr. Myers enhanced the marketability of the Kaiser Option after the DOFSICOD. But even he was not so bold as to claim other forces were not responsible too for its eventual sale at a handsome profit; he acknowledged rapid changes in the yen–dollar exchange rate were what finally made the sale possible. As he put it, "[a]nd all of a sudden what didn't make sense for [the Japanese buyers]

---

**Category 6.** The difference between the NMVs, plus or minus, of all property owned by one or both of the spouses at the conclusion of the evidentiary part of the trial and the total of the NMVs, plus or minus, includable in categories 1, 2, 3, 4, and 5.

*Id.* at ____, 740 P.2d at 40.

now [made] sense because they had the project at a fraction of what [it was] going to cost anybody else." We would then have to conclude the family court erred in not taking all the circumstances into consideration in deciding Mr. Myers was entitled to "the appreciation in value of the Kaiser Option after the date of separation," inasmuch as a portion thereof can only be characterized as passive appreciation unrelated to his activities.[7] Nor do we agree with the ICA that family court judges "should be bound by [a] rule that automatically presumes" a legal owner spouse is entitled to the appreciation in marital assets between the date of final separation in contemplation of divorce and the conclusion of the evidentiary part of a divorce trial. *Cassiday v. Cassiday*, 68 Haw. at 388, 716 P.2d at 1137.

Our divorce and separation laws do "not contemplate any [final] division of property other than where the person is divorced *a vinculo [matrimonii]*." *Clifford v. Clifford*, 42 Haw. 279, 283 (1958). This is consistent with the notion that "marriage is a partnership to which both [parties] bring their financial resources as well as their individual energies and efforts. That one partner brings to the marriage substantially greater [resources] than the other does not make this any less the case." *Cassiday v. Cassiday*, 68 Haw. at 387, 716 P.2d at 1136 (footnote omitted). A presumption that the non–owning spouse is not entitled to any part of the appreciation in property legally owned by the other after a declaration by either that the marriage has ended is inconsistent with the partnership model of marriage we have accepted and the rule that a final division of marital property can be decreed only when the partnership is dissolved.

The portions of the decree of divorce relating to the Kaiser Option and the Revere Copper investment are vacated.[8] *Woodworth v. Wood-*

---

[7]It may or may not be just and equitable when all the circumstances are considered to award Mrs. Myers part of this passive appreciation.

[8]The family court found the value of the Revere Copper investment on June 30, 1984 was $1,380,410.00 and awarded each spouse 50% of the asset. The ICA affirmed the award, finding "no evidence in the record of the value of Husband's Revere Copper investment" at the time of trial. The family court, however, found the investment was worth $1,430,820.00 on December 31, 1984. Thus, it erred here too in not considering all the circumstances in dividing the investment.

*worth*, 7 Haw. App. ____, 740 P.2d 36 (1987), is overruled to the extent it is inconsistent with this opinion,[9] and the case is remanded to the family court for proceedings not inconsistent with this opinion.

*Robert S. Kaufman* (Fain, Kaufman & Young, of counsel; with him on the writ and brief: *Lance S. Spiegel*; Fain, Kaufman & Young, P.C., of counsel; and *James E. Duffy, Jr.*; Fujiyama, Duffy & Fujiyama, of counsel) for petitioner–appellant.

*Daniel S. Ukishima* (*Craig G.H. Yim* with him on the brief) for respondent–appellee.

---

[9] We are not passing judgment here on the validity of Categories 1, 2, 3, 4, and 5. The issue posed on appeal is whether Category 6 is inconsistent with HRS § 580–47.