**Electronically Filed
Supreme Court
SCWC-12-0000806
04-JUN-2015
07:55 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

SUSAN P. GORDON, Respondent/Plaintiff-Appellee,

vs.

IRA GORDON, Petitioner/Defendant-Appellant.

SCWC-12-0000806

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0000806; FC-D NO. 10-1-6664)

June 4, 2015

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND POLLACK, JJ., AND
CIRCUIT JUDGE KUBO, ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY POLLACK, J.

Hawai'i law follows a framework based on partnership principles for the division of marital partnership property during divorce proceedings. This opinion addresses the application of partnership principles and a family court's discretion to deviate from an equal division of property when there are equitable considerations justifying such deviation.

Of central importance in this case is the family court's duty to provide sufficient documentation of its findings for its division of marital partnership properties so that the parties and reviewing court may ensure the division is equitable and free from miscalculations or other errors.

## I.   BACKGROUND

This case arises out of the Family Court of the First Circuit's[1] (family court) August 22, 2012 divorce decree dissolving the marriage between Ira Gordon (Ira) and Susan Gordon (Susan).[2]

### A. Factual Background

1.   Relationship Prior to Marriage

Susan and Ira, who married in December of 1997, first met in Las Vegas in the summer of 1992.  At the time they met, Ira was living in Hawai'i and was married but separated.  Between 1992 and 1993, Ira made several trips to Las Vegas to work and to spend time with Susan, who lived and worked in Las Vegas. Susan also made several trips to Hawai'i to visit Ira, and she would typically stay with Ira at his residence during her visits.

---

[1]     The Honorable Francis Q.F. Wong presided.

[2]     This case involves a consolidated appeal from the family court's August 22, 2012 Decree Granting Absolute Divorce and the family court's November 28, 2012 Order re: Plaintiff's Motion and Declaration For Post-Decree Relief Filed September 26, 2012.

In 1993, Susan moved to Hawai'i to live with Ira at his residence. On January 12, 1995, Susan purchased a residence, which the parties moved into a few months later. By the time Ira's divorce was finalized on March 14, 1996, Ira and Susan had been living together at the residence purchased by Susan for one year. Susan paid the mortgage on the residence without contribution from Ira during this time.

2. Marriage and Tax Liability

Ira and Susan were married on December 16, 1997, and they subsequently filed their joint tax return for 1997. Ira was responsible for filing and paying the taxes. The parties received a home interest tax deduction in the amount of $40,605 for the residence initially purchased by Susan. The 1997 joint tax return, which was considered by the family court to be the best evidence of the parties' pre-marital property, listed thirteen rental properties and three businesses. The return included reference to three Texas properties owned by Susan, and several properties that were distributed to Ira in the divorce decree relating to his prior marriage.

The parties continued to live in the residence initially purchased by Susan until July 2010. During that time, the parties twice obtained equity lines of credit against the residence. The first line of credit was $150,000, and it was used primarily for the down payment on two investment

properties, with the remaining $58,119.67 balance being deposited into a bank account held by Susan.

The second line of credit in the amount of $450,000 was obtained in March 2010, and the family court found that the parties obtained it, in part to satisfy the couple's outstanding tax liability.  On March 12, 2010, Ira deposited $280,000 from the second equity line into his personal bank account, and he withdrew $103,000 from that account in the form of a cashier's check payable to the Internal Revenue Service (IRS), with the memo line stating "various tax returns."  However, this payment did not satisfy the couple's entire debt owed to the IRS, and by the time of trial, the couple still owed approximately $140,000 to the IRS originating from past tax liability for the principal amount of $116,000, plus penalties and accruals.  Susan testified that she believed the $280,000 had been used to pay off the parties' entire tax debt.

3.    Ira's Girlfriend

At some point as early as the beginning of 2009, Ira began dating a woman, whom he eventually lived with at one of Susan and Ira's properties.[3]  On May 20, 2009, Ira opened a

---

[3]    The record is unclear as to when Ira began dating and living with his girlfriend.  Ira initially testified that the relationship began in late 2009, but when confronted at trial with the fact that he purchased airline tickets for his girlfriend and her daughter in December 2008, Ira admitted the relationship began in early 2009.  Additionally, Susan testified that Ira had been living with his girlfriend and her daughter since August 2009.

massage parlor for his girlfriend, which was listed on Ira and Susan's 2009 joint income tax return.  In 2010, the massage parlor was raided by Honolulu police, resulting in the arrest of Ira's girlfriend for prostitution, and Ira paid at least $10,000 out of the business's account for her criminal defense.

As mentioned earlier, Ira deposited $280,000 from the second equity line into his personal account, which Susan believed would be used to satisfy their tax liability. Following his deposit of the money, Ira made purchases of jewelry for his girlfriend on March 13, 2010, and April 9, 2010, totaling over $30,000.  He also traveled with his girlfriend and her daughter to the Big Island and Las Vegas, and he remodeled the unit they all lived in together.

4.   Separation and Divorce

On July 24, 2010, Ira and Susan argued at their residence regarding Ira's infidelity and his desire to end the marriage.[4]  That month, Ira permanently left the residence he shared with Susan, and Susan filed for divorce on July 28, 2010. The family court found that the exact date at which Ira "moved out" of the marital residence was "unclear," but the family

_____

[4]   Susan alleged that Ira assaulted her and threatened to kill her, which resulted in Ira's arrest on the same day.  On August 5, 2010, the case against Ira for the alleged incident was formally classified "no action" by the prosecutor's office.

court's findings repeatedly referred to the "July 2010" date as the time at which the parties separated.

In August 2010, without Ira's knowledge and consent, Susan changed the beneficiary designation on Ira's existing life insurance policy; obtained another life insurance policy, naming herself as the beneficiary and authorizing the premium to be paid out of Ira's checking account; and terminated their home equity line, removing around $7,000.

Susan first learned of her and Ira's outstanding tax liability when she received a letter from the IRS notifying her that her monthly social security check of $484 would be garnished in the amount of $72.60 for nonpayment of taxes. Susan filed for innocent spouse relief, but her application and subsequent appeal were both denied by the IRS.

Susan remained at the couple's marital residence until it was sold on May 24, 2011, in conjunction with the divorce proceedings. The family court found that Susan's only regular sources of income were her monthly social security check, money given to her by her sister, and the periodic disbursements made from the marital funds that were held in escrow at the time. However, statements from Susan's personal bank account indicate that from December 2009 to April 2012, approximately $390,000

was deposited into her account.[5]  In her Income and Expense

Statement filed November 7, 2011, eight months before trial,

Susan stated that her monthly personal expenses amounted to

$1,390.

At the time of trial, Susan was living in a rented

room in Waikiki and was renting a vehicle because the one left

in her possession was broken-down.  Ira was living at the

property he moved into with his girlfriend and was receiving

regular income from three businesses, including the massage

parlor.

## B. Court Proceedings

On July 28, 2010, Susan filed a Complaint for Divorce

against Ira in the family court.  A two-day divorce trial took

place in June of 2012.

On July 17, 2012, Ira filed a closing argument,

proposed findings of fact and conclusions of law, and a property

division chart identifying and valuing the assets at the date of

marriage and date of the trial's conclusion.  On July 18, 2012,

Susan filed a closing argument and proposed findings of fact and

---

[5]      The record also indicates the following: from February 2010 to March 2010, Susan donated $23,550 to her sister's convent; from February 2010 to March 2012, Susan received $98,034.74 in purported reimbursements from the convent; and from April 2010 to March 2012, Susan "cashed out" $49,221.91 out of her personal bank account, including $7,168.59 on September 7, 2010, in the form of a money market account.

conclusions of law, and, on August 22, 2012, she filed a proposed divorce decree.

1. Family Court Minute Order and Ira's Motion for Reconsideration

On July 24, 2012, the family court, by minute order, adopted Susan's recommended findings of fact and conclusions of law with modifications. On August 3, 2012, Ira filed a motion for reconsideration of the family court's minute order decision and the amended minute order. Ira contended that the family court made a multitude of errors in its property division. Ira pointed out that the family court made the "colossal mistake of $538,200" by awarding real property to Ira that was no longer in the parties' possession as it was sold prior to 2005.

2. Divorce Decree

On August 22, 2012, the family court filed its Findings of Fact and Conclusions of Law, Decree Granting Absolute Divorce (Decree), and Order Denying Defendant's Motion for Reconsideration, Filed August 3, 2012.

In its Decree, the family court found that the equities in this case were skewed in favor of Susan, and the court concluded that the record fully supported deviation from equal distribution of the marital estate to a 75%/25% distribution in favor of Susan. The court found that Ira's "actions throughout the relationship, including the pre-

partnership phase through and including the post-filing phase, time and again placed [Susan] in worsening financial circumstances." In its Findings of Facts and Conclusions of Law, the family court noted that there were valid and relevant considerations authorizing a deviation from the partnership model. The family court stated that it would use the outstanding federal tax liability as a factor to deviate from a strict 50/50 division although the court noted that it had a "sufficient basis" to allocate the entirety of the debt to Ira. The court also found the liquidation of Susan's three Texas properties and a bond she held prior to the marriage to be valid and relevant considerations in deviating from the marital partnership model.

The family court found that Susan purchased the couple's marital residence for $685,000 on January 12, 1995, and the court noted that Susan paid for the property as follows: (1) $21,674.13 in deposit/earnest money; (2) $486,500.00 in the form of a mortgage; and (3) $200,000 as an option payment. The court concluded that "these funds" constituted a pre-marital capital contribution to the partnership.

With respect to one of the Texas properties, the family court found that the property was not encumbered by a mortgage, was sold in February or March 1999, and generated proceeds in the amount of $29,270.40, which also constituted a

pre-marital capital contribution to the partnership.  In regard to the other two Texas properties, the family court found that the properties were encumbered by a mortgage and were sold at some point during the marriage.  The court additionally found that Susan was entitled to a pre-marital credit for the value of the bond Susan liquidated in support of the marital partnership.

As for Ira's pre-marital capital contributions, the court found that Ira "brought numerous real properties into the economic partnership and marriage" with Susan and that the best evidence reflecting this was Ira's first divorce decree and separation agreement.  The family court also found that these properties "were not unencumbered by debt."  However, the family court did not make any findings as to the value of Ira's pre-marital contribution but instead found "that the appraised values of the properties are irrelevant to [Ira's] equity interest in the properties."

In its Decree, the family court divided the parties' real properties into three groups: (1) properties awarded to Susan; (2) properties awarded to Ira; and (3) properties to be sold with the proceeds to be awarded 75% to Susan and 25% to Ira.  The Decree awarded three properties to Susan and ten properties to Ira, while designating four properties for sale and distribution of the proceeds.  The family court awarded Ira the property that Ira previously raised in his motion for

reconsideration as being no longer in the parties' possession having been sold prior to 2005. The escrow account for the parties' marital residence, which was to be sold, was first to be used to pay the existing IRS debt in full before being distributed to the parties.

The family court did not file a property division chart or other document explaining its categorizations of the properties and its computations related to the property division. The court noted that Susan and Ira stipulated to the appraised values of the properties in existence at the date of marriage and in the month prior to trial; however, these values are not clear from the court's findings.

Susan was awarded a "property settlement" in the amount of $41,830, "representing the marital assets willfully wasted" by Ira in "his new romantic relationship."[6] This amount appears to correspond to the family court's finding that Ira paid at least $10,000 for his girlfriend's criminal defense and purchased over $30,000 in jewelry for her.

The family court also awarded Susan monthly alimony in the amount of $3,000 per month for ten years. The court stated its reason for awarding alimony:

---

[6] Susan was also awarded $40,875 representing her 75% share of a business investment and the value of the vehicles awarded to Ira.

11

> Based on the length of the marriage, the financial conduct of the parties as it affected the economic partnership of the parties both pre and post marriage, the small amount of social security income received by [Susan] as her only source of continuing income (said source having been compromised by [Ira]'s actions), and the current age of [Susan], the Court will award alimony by [Ira] to [Susan] .
> . . .

The court also awarded Susan two of Ira's retirement accounts and specified that Susan shall be Ira's sole beneficiary under his life insurance policy.

The family court awarded Ira his real estate business and the massage parlor business.

3. Appeal

On September 20, 2012, Ira filed a notice of appeal from the Decree and the family court's Findings of Fact and Conclusion of Law. Ira asked the Intermediate Court of Appeals (ICA) to vacate the property division and alimony award. Ira argued that the court erred in deviating from partnership principles based on Ira's financial misconduct, in distributing the parties' properties without a clear application of partnership principles or explanation for its division, and in awarding alimony based on Ira's financial misconduct rather than on the factors required by Hawai'i law.[7]

Susan urged the ICA to affirm the family court's Decree. Regarding property division, she argued that the family

---

[7] Ira also argued that the family court erred when a different judge from the one that conducted the trial signed the Decree.

court distributed the parties' marital assets and debts almost equally, and she maintained that Ira failed to meet his burden to show that he had any net value assets at the time the economic partnership began. Susan also argued that the family court's alimony award was "very reasonable" considering Susan's "dire economic situation" and Ira's income.

In its Memorandum Opinion issued on November 29, 2013, the ICA vacated the Decree as it pertained to the property division and remanded the case for further proceedings. The ICA affirmed the family court's deviation from partnership principles, finding that Ira's financial misconduct constituted a "valid and relevant circumstance" as it reduced the marital estate and "continues to reduce Susan's income." The ICA also affirmed the family court's awarding of $41,830 to Susan for wasted marital assets as a result of Ira's relationship with his girlfriend. The ICA reasoned that because there was evidence that the date of final separation could have happened before the expenditures, the family court did not err in considering the expenditures in deviating from the partnership model.

The ICA rejected Ira's argument that the family court's property division appeared "arbitrary" absent a property division chart or justification of its division of marital property. The ICA found that the "family court was able to identify and value marital assets without a property division

chart." The ICA also found that "the family court's decision to award alimony to Susan contrary to Ira's representations of his own needs" was not an abuse of discretion in light of the family court's "negative credibility findings" with respect to Ira.

Although the ICA found that the family court was able to identify and value marital assets without a property division chart, the ICA found that the family court committed reversible error by distributing a property to Ira that was no longer in the parties possession at the time of the divorce. Consequently, the ICA vacated the Decree as it pertained to the property division and remanded the case for further proceedings.

Ira filed his Application for Writ of Certiorari with this court following the ICA's January 3, 2014 Judgment on Appeal.

## II.    STANDARDS OF REVIEW

The family court's findings of facts are reviewed under the clearly erroneous standard, while the court's conclusions of law are reviewed de novo under the right/wrong standard.  Kakinami v. Kakinami, 127 Hawai'i 126, 136, 276 P.3d 695, 705 (2012).

"We review the family court's final division and distribution of the estate of the parties under the abuse of discretion standard, in view of the factors set forth in HRS § 580-47 and partnership principles."  Tougas v. Tougas, 76 Hawai'i

14

19, 868 P.2d 437 (1994) (quoting Gussin v. Gussin, 73 Haw. 470, 486, 836 P.2d 484, 492 (1992)) (footnote omitted).  The family court's determination of whether facts present valid and relevant considerations authorizing a deviation from the partnership model division is a question of law that this court reviews under the right/wrong standard of appellate review. Jackson v. Jackson, 84 Hawai'i 319, 332-33, 933 P.2d 1353, 1366-67 (App. 1997).

### III.    DISCUSSION

Ira raises three issues in his application.  First, whether the family court erred in failing to support its property division determination with a property division chart or other documented showing of its categorizations, valuations, and computations.  Second, whether the family court erred in deviating from partnership principles when it based its determination of marital property division and alimony on Ira's alleged financial misconduct.  Finally, whether the family court erred in its award of alimony to Susan by not considering Susan's actual financial need and Ira's age, health, ability to pay, and adverse financial condition.

### A. Whether the Family Court Failed to Adequately Support the Property Division

Ira argues that in the absence of a property chart or other schedule reflecting the family court's categorizations and

computations, the reviewing court is faced with an "impossible" task of trying to determine the basis for the trial court's "unexplained property division ruling" in deciding whether the family court's division of the property appears to be "just and equitable."

1. Partnership Principles

Under HRS § 580-47 (2006),[8] the family court has wide discretion to divide marital partnership property according to what is "just and equitable" based on the facts and circumstances of each case. Tougas, 76 Hawai'i at 26, 868 P.2d at 444. Hawai'i case law follows a framework based on partnership principles that provides guidance for family courts in dividing marital partnership property. Kakinami, 127 Hawai'i at 137, 276 P.3d at 706; see also Tougas, 76 Hawai'i at 28, 868 P.2d at 446 ("The partnership model is the appropriate law for the family courts to apply when exercising their discretion in the adjudication of property division in divorce proceedings.");

---

[8]     HRS § 580-47 provides that upon granting a divorce, the family court may "make any further orders as shall appear just and equitable . . . finally dividing and distributing the estate of the parties, real, personal, or mixed, whether community, joint, or separate." In making these orders, the family court shall consider "the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, and all other circumstances of the case." HRS § 580-47(a) (2006). HRS § 580-47(a) was amended in 2011 to also require the consideration of "the concealment of or failure to disclose income or an asset, or violation of a restraining order." See HRS § 580-47(a) (Supp. 2011).

Gussin, 73 Hawai'i at 471, 836 P.2d at 486 (noting that the partnership model of marriage "provides the necessary guidance to the family courts in exercising their discretion and to facilitate appellate review").

The partnership model distinguishes between marital partnership property that is brought into the marriage and marital partnership property that is acquired during the marriage.[9] Accordingly, Hawai'i courts assign values to marital partnership property using five categories designed to assist courts in determining the equitable division and distribution of property between spouses:

Category 1 includes the net market value of property separately owned by a spouse on the date of marriage;[10]

Category 2 includes the increase in the net market value of Category 1 property during the marriage;[11]

---

[9]     Marital separate property is not discussed in this opinion.

[10]     See Tougas, 76 Hawai'i at 27, 868 P.2d at 445 ("The net market value "plus or minus, of all property separately owned by one spouse on the date of marriage . . . but excluding the [net market value] attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.").

[11]     See id. (describing Category 2 as the increase in the net market value of all property whose net market value on the date of marriage "is included in category 1 and that the owner separately owns continuously from the" date of marriage to the date of the conclusion of the evidentiary part of the trial).

17

Category 3 includes the net market value of property separately acquired by gift or inheritance during the marriage;[12]

Category 4 includes the increase in the net market value of Category 3 property during the marriage;[13] and

Category 5 includes the net market value of the remaining marital estate at the conclusion of the evidentiary part of the trial.[14]  See Tougas, 76 Hawai'i at 26, 868 P.2d at 444.

Each partner's individual contributions to the marriage, i.e., the values of Category 1 and Category 3, are to be repaid to the contributing spouse absent equitable considerations[15] justifying a deviation.  See Tougas, 76 Hawai'i at 26, 868 P.2d at 444; see also Helbush v. Helbush, 108 Hawai'i 508, 512-13, 122 P.3d 288, 292-93 (App. 2005); Wong v. Wong, 87

---

[12]     See id. (describing Category 3 as the date-of-acquisition net market value, "plus or minus, of property separately acquired by gift or inheritance during the marriage but excluding the [net market value] attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party").

[13]     See id. (describing Category 4 as the increase in the net market value of all property whose net market value "on the date of acquisition during the marriage is included in category 3 and that the owner separately owns continuously from the date of acquisition to the" date of the conclusion of the evidentiary part of the trial).

[14]     See id. (describing Category 5 as the difference between the net market values, "plus or minus, of all property owned by one or both of the spouses on the [date of the conclusion of the evidentiary part of the trial] minus the [net market values], plus or minus, includable in categories 1, 2, 3, and 4").

[15]     Hawai'i courts frequently refer to "valid and relevant considerations" and "valid and relevant circumstances" when discussing deviation from partnership principles.  We also use the term "equitable considerations" in this opinion.

Hawai'i 475, 483, 960 P.2d 145, 153 (App. 1998). Absent equitable considerations justifying a different result, the increase in the value of each partner's individual contributions to the marriage, i.e., the values of Category 2 and Category 4, are divided equally between the parties. See Tougas, 76 Hawai'i at 26, 868 P.2d at 445. The value of Category 5, which is the net profit or loss of the marital partnership after deducting the other four categories, is to be divided equally unless equitable considerations merit deviation. Id.; see also Helbush, 108 Hawai'i at 513, 122 P.3d at 293 ("[I]f there is no agreement between the husband and wife defining the respective property interests, partnership principles dictate an equal division of the marital estate 'where the only facts proved are the marriage itself and the existence of jointly owned property.'" (quoting Gussin, 73 Haw. at 482, 836 P.2d at 491)). In other words, the values of Category 2, Category 4, and Category 5 are awarded one-half to each spouse absent equitable considerations justifying deviation from a 50/50 distribution. Jackson, 84 Hawai'i at 332, 933 P.2d at 1366.

The partnership model requires the family court to first find all of the facts necessary for categorization of the properties and assignment of the relevant net market values. Id. at 332, 933 P.2d at 1367. Second, the court must identify any equitable considerations justifying deviation from an equal

19

distribution.  Id.  Third, the court must "decide whether or not there will be a deviation," and in its fourth step, the court decides the extent of any deviation.  Id.

2.    Division of Property in This Case

The ICA held that the family court clearly exceeded the bounds of reason by awarding a non-existent asset valued at $538,200 to one spouse, necessitating remand to the family court for re-division of the property.  Despite the award of a property that had been sold several years before the divorce, the ICA found that the "family court was able to identify and value marital assets without a property division chart."  The record, however, indicates otherwise.  Thus, we also consider whether the record in this case is adequate for review of the equities of the family court's division of the marital estate.

The family court divided the real estate properties of the marital estate into three groups: (1) properties to be distributed to Susan (three); (2) properties to be distributed to Ira (ten); and (3) properties to be sold with the proceeds to be divided between Susan and Ira (four).  In its division of the real properties into these three groups, the family court did not list any of the properties' outstanding mortgages or net market values either at the date of marriage or close of evidence at trial.  The family court also did not assign net

20

market values to each property according to the categories of the partnership model.

While the family court made several findings regarding Susan's pre-marital capital contribution and the valuation of her properties, these findings were incomplete. The court found that the funds Susan used to purchase the marital residence constituted a pre-marital capital contribution to the partnership. The family court also found that the liquidation of one of Susan's Texas properties constituted a pre-marital capital contribution to the partnership. However, the family court did not specify the value of the marital residence or the Texas property on the date of marriage or the increase in value of the properties during the marriage. With respect to the other two Texas properties, the family court found that the properties were encumbered by a mortgage and were sold during the marriage, but the court did not determine the proceeds of the sales or assign values to the property. Additionally, it is not clear whether the court credited Susan with the proceeds of the sales of these properties as pre-marital capital contributions.

With respect to the family court's findings regarding Ira's pre-marital capital contributions, the court found only that Ira "brought numerous real properties into the economic partnership and marriage" and that the best evidence of this was

21

the divorce decree and separation agreement from his previous divorce. The family court found that these properties "were not unencumbered by debt," but the court did not include in its findings the net market values of any of Ira's "numerous real properties" on the date of marriage or the increase in value of the properties during the marriage.

As a result, the family court's findings do not reflect that the court credited Ira with any pre-marital capital contributions. The absence of such findings renders it infeasible for the parties and the reviewing court to understand the basis for the property division. Further, in the absence of determinations of pre-marital net market values of assets at the date of marriage and the close of evidence at trial and a categorization of the marital assets, the reviewing court is not able to discern whether or not the family court correctly calculated its overall property division.

3. Property Division Chart

It is well established that a family court is guided in divorce proceedings by partnership principles in governing division and distribution of marital partnership property. See Helbush, 108 Hawai'i at 513, 122 P.3d at 293. It is axiomatic that a family court cannot satisfactorily fulfill its responsibility under general partnership principles to determine each party's contributions and equitably divide marital property

22

without first assessing the net market values of the parties' respective properties at various time frames.  See Jackson, 84 Hawai'i at 332, 933 P.2d at 1366 (describing what the partnership model requires of the family court).

In Higashi v. Higashi, 106 Hawai'i 228, 103 P.3d 388 (App. 2004), the ICA held that, in applying partnership model principles and determining property categorizations, the family court should utilize a property division chart or other similar document.  Higashi directs the family court to file, as part of its findings and conclusions, a property division chart that includes the following:

(1) all of the parties' assets stating the relevant net market values of the assets using the five-category scheme of the partnership model,

(2) the partnership model division of the assets,

(3) the actual division of the assets, and

(4) an explanation of the reasons for the material differences between the partnership model division and the actual division.[16]  Id.

---

[16]     Specifically, Higashi directs the family court to include the following in its property division chart:

> (a)  an itemized list of each of plaintiff's Category 1 and 3 assets/debts, stating (i) the Category 1 and 3 value/amount of each and (ii) the Category 2 and 4 net market value of each asset;

(continued. . . )

A family court that chooses to ignore the sound recommendation of the Higashi decision runs the risk that its decision will not appear "just and equitable" to the reviewing court and the parties.  We endorse the recommendation made by the Higashi court and emphasize that a chart or equivalent itemization of the information required by the five-category partnership model is a valuable and important tool for the family court to properly divide property and afford transparency to the parties and reviewing court.  See Higashi, 106 Hawai'i at 230, 103 P.3d at 390 (providing a detailed description of what the family court's property division chart should include).

---

(. . .continued)

  (b) an itemized list of each of defendant's Category 1 and 3 assets/debts, stating (i) the Category 1 and 3 value/amount of each and (ii) the Category 2 and 4 net market value of each asset;

  (c) an itemized list of each of plaintiff's and/or defendant's Category 5 assets/debts stating the net market value of each;

  (d) an itemized statement of the Partnership Model Division of each of the assets/debts owned/owed at the time of the divorce;

  (e) an itemized statement of the actual division by the court of each of the assets/debts owned/owed at the time of the divorce;

  (f) an itemized statement of the specifics of each material difference between (i) the Partnership Model Division and (ii) the actual division by the court; and

  (g) a statement/explanation of the court's reason(s) for each material difference.

Higashi, 106 Hawai'i at 230, 103 P.3d at 390 (formatting added).

Given the numerous omissions of property categorizations and net market values in this case, the record is deficient to enable meaningful appellate review of the family court's distribution of the marital estate.

### B. Whether the Family Court's Deviation from a 50/50 Division of the Marital Estate in Addition to a Deduction for Marital Waste Was Justified

While the ICA has remanded this case for re-division of the property, the ICA upheld the family court's deviation from partnership principles. Thus, we consider whether Ira's dissipation of marital assets through gifts and payments to his girlfriend and negligently late payments to the IRS constitute equitable considerations allowing deviation from marital partnership principles in the division of the marital estate.

In its decision, the ICA found that Ira's conduct with respect to the IRS tax debt constituted a valid and relevant circumstance for deviation from marital partnership principles. The ICA reasoned that the present and future garnishment of Susan's social security check was an appropriate factor for the family court to consider in deviating from an equal division of their marital partnership property. Further, the ICA affirmed the family court's designation of Ira's financial misconduct as a waste of marital assets. In his Application, Ira suggests that the ICA's analysis condones the family court's punishing of him twice for the same conduct.

Because the family court appeared to treat Ira's financial misconduct as an equitable consideration justifying deviation from partnership principles and as marital waste during the divorce to be charged to Ira, we discuss both concepts below.

1.  Deviation from Partnership Principles and Marital Waste

As discussed, Hawai'i law follows a partnership model that governs the division and distribution of marital partnership property.  Helbush, 108 Hawai'i at 513, 122 P.3d at 293.  "[W]hile the family court judges are accorded wide discretion pursuant to HRS § 580-47 in adjudicating the rights of parties to a divorce, the family court strives for 'a certain degree of uniformity, stability, clarity or predictability in its decision-making and thus are compelled to apply the appropriate law to the facts of each case and be guided by reason and conscience to attain a just result.'"  Tougas, 76 Hawai'i at 28, 868 P.2d at 446 (alteration omitted) (quoting Gussin, 73 Haw. at 486, 836 P.2d at 492).  Accordingly, our law provides certain parameters for a family judge's discretion.

While a family court is not required to presume specific percentage splits in the division of each category of property, Gussin, 73 Haw. at 481, 836 P.2d at 490, it must exercise its discretion within the framework provided by our

law.  The family court's first step is to find the requisite facts under the partnership model (i.e., utilize the five categories and assign net market values) before proceeding to the second step of deciding whether or not the facts present any equitable considerations warranting deviation from the partnership model.  Jackson, 84 Hawai'i at 332, 933 P.2d at 1366.

Whether equitable considerations exist justifying deviation from partnership principles is a separate issue from whether or not the court should charge a divorcing party for wasted marital assets.  A family court may charge a divorcing party for wasted marital assets when, during the divorce, "a party's action or inaction caused a reduction of the dollar value of the marital estate under such circumstances that he or she equitably should be charged with having received the dollar value of the reduction."  Higashi, 106 Hawai'i at 241, 103 P.3d at 401.

As discussed below, in the case of marital waste, the wasted assets are treated as a part of the marital partnership property that has already been awarded to the spouse responsible for the waste.  This is a separate consideration from whether or not to deviate from partnership principles.  Because these are distinct legal considerations, we discuss equitable deviation from the partnership model separately from chargeable deductions for marital waste.

2.    Equitable Deviation from the Partnership Model

In determining whether the circumstances justify deviation from the partnership model, the family court must consider the following:

> the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, and all other circumstances of the case.

HRS § 580-47(a) (2006); see also Jackson, 84 Hawai'i at 333, 933 P.2d at 1367. "Other than relative circumstances of the parties when they entered into the marital partnership and possible exceptional situations, the above-quoted part of HRS § 580-47(a) requires the family court to focus on the present and the future, not the past." Jackson, 84 Hawai'i at 333, 933 P.2d at 1367.[17] In other words, deviation from the partnership model should be based primarily on the current and future economic needs of the parties rather than on punishing one party for financial misconduct.[18]

In its Findings of Facts and Conclusions of Law, the family court found that there were valid and relevant

---

[17]    See also Jacoby v. Jacoby, 134 Hawai'i 431, 448, 341 P.3d 1231, 1248 (App. 2014); Epp v. Epp, 80 Hawai'i 79, 89, 905 P.2d 54, 64 (App. 1995).

[18]    Under the 2011 amendments to HRS § 580-47(a), a court must also consider "the concealment of or failure to disclose income or an asset, or violation of a restraining order." See HRS § 580-47(a) (Supp. 2011). These amendments do not apply in this case. See 2011 Haw. Sess. Laws Act 140, § 3 at 356 (providing an effective date of October 1, 2011, and stating that the act "does not affect rights and duties that matured, penalties that were incurred, and proceedings that were begun before its effective date").

circumstances for departure from the partnership model. The family court considered the outstanding federal tax liability and the liquidation of Susan's three Texas properties during the marriage to be equitable considerations. In the Decree, the court found that the equities in this case were skewed in favor of Susan, and the court explained that Ira's "actions throughout the relationship . . . time and again placed" Susan "in worsening financial circumstances." Thus, the family court apparently found an equitable consideration based on Ira's financial misconduct.

The family court focused on Ira's financial misconduct while "underemphasiz[ing] the relative abilities of the parties and the condition in which each party will be left after the divorce." See Hatayama v. Hatayama, 9 Haw. App. 1, 11, 818 P.2d 277, 282 (1991). This evidences "a fundamental misunderstanding of the economic consequence of being married." Id. Divorce "is not a vehicle by which one spouse is compensated for having given more than he or she received during the marriage or for having had to suffer during the marriage from the other spouse's inadvertent, negligent, or intentional inadequacies, failures, or wrongdoings, financial or otherwise." Id.; cf. Richards v. Richards, 44 Haw. 491, 509, 355 P.2d 188, 198 (1960) (explaining that "respective merits of the parties" as used in HRS § 580-47 does not have "any reference to personal conduct of the spouse"

but only means the "merits of the respective claims of the spouses"). Thus, the court's analysis in deciding whether or not to apply a deviation should focus on the abilities of the parties and the circumstances in which each party will be left by the divorce.

Consequently, Ira's financial misconduct during the marriage should not have been considered by the family court when deciding whether to deviate from an equal division of marital partnership property in the absence of a finding of extraordinary circumstances.[19] Instead, the family court should have focused on the factors set forth in HRS § 580-47(a) in making its determination of whether or not equitable considerations justified a deviation from an equal division of the marital partnership property. Accordingly, the family court's decision to deviate from an equal division to a 75/25 division was an abuse of discretion to the extent the family court considered Ira's financial misconduct to be a "valid and relevant consideration."

Although financial misconduct is not a proper consideration in determining a deviation from partnership

---

[19]     In Hatayama the ICA noted that a spouse's financial misconduct may justify a deviation in "extraordinary circumstances." 9 Haw. App. at 12, 818 P.2d at 283. The family court may, on remand, consider whether this case presents "extraordinary circumstances."

principles in the absence of a finding of exceptional circumstances, our law does allow for a court to charge a divorcing party for marital waste during the pendency of a divorce, which is discussed in the next section.

  3. Chargeable Deduction for Marital Waste

   Hawai'i courts charge a divorcing party for marital waste during the divorce when doing so would be equitable.  See Chen v. Hoeflinger, 127 Hawai'i 346, 358, 279 P.3d 11, 23 (App. 2012); Higashi, 106 Hawai'i at 241, 103 P.3d at 401.  It is fundamental to recognize that marital waste is only a chargeable deduction if it occurs during the divorce; thus, "a reduction of the value of the marital estate during the marriage, but prior to the time of the divorce, is not a chargeable reduction." Higashi, 106 Hawai'i at 241, 103 P.3d at 401.  Thus, a court cannot find that a party's use of marital partnership property is chargeable as marital waste without first finding the date on which the divorce commenced.  See id.

   The divorce commences on the earliest of the following dates:

  (1) the filing of a complaint for divorce;

  (2) the date of final separation (i.e., the earlier of the date the trial is completed or the unconditional, unmodified communication from one spouse to the other that the marriage has ended and divorce is desired); or

(3) a substantial step is taken toward final separation, which later occurs, or filing the complaint, which later is filed.  See Higashi, 106 Hawai'i at 241, 103 P.3d at 401; Myers v. Myers, 70 Haw. 143, 151-52, 764 P.2d 1237, 1243 (1988) (defining the date of final separation).

In the present case, the family court did not make a finding that the parties' divorce commenced on a specific date. While the family court found that Ira purchased airline tickets for his girlfriend and her daughter in December 2008 and began dating and living with her in 2009, the court did not make a specific finding of the date the divorce commenced for the purpose of determining whether dollar reductions to the value of the marital estate were chargeable to Ira.

Although the family court found that the exact date at which Ira "moved out" of the marital residence was "unclear," the family court's findings referred to the "July 2010" date as the "time of separation."  Notwithstanding the absence of a finding regarding the date the divorce commenced, the ICA held that the parties' divorce date occurred prior to 2010 because Ira took a substantial step towards the date of separation through the purchases expended on his girlfriend.

The family court awarded Susan $41,830 representing wasted marital assets with regard to Ira's relationship with his girlfriend.  Presumably, the family court awarded Susan this

amount in light of the $10,000 Ira paid for his girlfriend's criminal defense in addition to the $30,000 he spent on jewelry in 2010.[20]  However, the family court should have first determined the parties' date on which the divorce commenced before designating Ira's expenditures on his girlfriend as marital waste.  If the starting date of the divorce was a date in early 2009, any subsequent dissipation of marital assets, which would include the jewelry expenditures, could be chargeable to Ira as marital waste, and the family court may accordingly "treat that dollar amount as having been awarded to the divorcing party who caused that chargeable reduction."[21]

Higashi, 106 Hawai'i at 241-42, 103 P.3d at 401-02.  However, if the divorce began in July 2010, Ira's dissipation of marital

---

[20]    Ira's purchasing of the $30,000 in jewelry for his girlfriend is closely related to his failure to pay the IRS tax debt in full with the second home equity line.  The family court found that the money Ira used for the purchase of the jewelry "was intended to be utilized for the payment of taxes."  On remand, the family court may consider whether the excess penalties and fees incurred because of Ira's failure to pay the IRS debt with the second equity line should be considered a wasted marital asset. This determination will depend on the court's determination of the date of the commencement of the divorce.

[21]    Instead of considering Ira's expenditures on his girlfriend as having been awarded to Ira, the family court awarded Susan a property settlement to be paid from Ira's share of the escrow account for the marital residence, and if the funds from the escrow account were insufficient, Ira would have to make payment in full within a certain number of days from the filing of the Decree.  The amount of the settlement awarded to Susan appeared to be the full value of the waste.  This is contrary to Higashi, which requires the court to treat the dollar amount as being a part of the marital partnership property and treating it as already awarded to Ira.  In requiring Ira to pay the full amount of the waste to Susan, the family court required Ira to pay more than he was required under the Higashi approach.

assets could not be considered a chargeable reduction because the March and April 2010 jewelry purchases would be considered as having occurred during the marriage.  Id. at 241, 103 P.3d at 401.

Thus, absent a finding by the family court regarding the date the divorce commenced, it is unclear as to whether or not Ira's dissipation of marital assets should have qualified as a chargeable reduction in the division of marital assets.  The ICA therefore erred in affirming the family court's award to Susan for wasted marital assets.[22]

### C. Whether the Family Court Erred by Basing the Alimony Award on Ira's Financial Misconduct

In his third question presented, Ira argues that the family court erroneously based its alimony ruling on its finding of his financial misconduct while failing to consider Susan's "actual expenses" and his "age, health, ability to pay, and "adverse financial condition after the divorce."  The ICA declined to find that the family court's alimony award to Susan constituted an abuse of discretion in light of the family court's finding that Ira was "not credible."

---

[22]  Consequently, we do not address Ira's argument that the family court and the ICA also erred by penalizing him twice for the asserted financial misconduct by treating it both as an equitable consideration justifying deviation from partnership principles and as marital waste.

However, because the court's division of property likely had an impact in determining Susan's entitlement to alimony, the ICA should have also vacated the family court's alimony award.[23]  Kuroda v. Kuroda, 87 Hawai'i 419, 430, 958 P.2d 541, 552 (App. 1998) (vacating an alimony award and remanding for reconsideration in light of the court's decision to vacate the corresponding property division of the divorce decree).

Secondly, although the ICA characterized the family court as having relied on the financial condition of the parties in determining the alimony award, the family court's justification for the award apparently took into account Ira's financial misconduct.  Because alimony will be re-determined on remand, we discuss the appropriate circumstances that may be considered in an award of spousal support.

HRS § 580-47(a) (2006) requires the family court upon decreeing a separation to take into consideration the following criteria when making further orders for the support and maintenance of either spouse: "the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, and all other circumstances of the case."  The court

_____

[23]    We do not suggest that vacating a division of property would require vacating an award of alimony in all cases.

35

must also consider all of the following factors in ordering

spousal support and maintenance:

> (1) Financial resources of the parties;
>
> (2) Ability of the party seeking support and maintenance to meet his or her needs independently;
>
> (3) Duration of the marriage;
>
> (4) Standard of living established during the marriage;
>
> (5) Age of the parties;
>
> (6) Physical and emotional condition of the parties;
>
> (7) Usual occupation of the parties during the marriage;
>
> (8) Vocational skills and employability of the party seeking support and maintenance;
>
> (9) Needs of the parties;
>
> (10) Custodial and child support responsibilities;
>
> (11) Ability of the party from whom support and maintenance is sought to meet his or her own needs while meeting the needs of the party seeking support and maintenance;
>
> (12) Other factors which measure the financial condition in which the parties will be left as the result of the action under which the determination of maintenance is made; and
>
> (13) Probable duration of the need of the party seeking support and maintenance.

HRS § 580-47(a); Cassiday v. Cassiday, 6 Haw. App. 207,

215, 716 P.2d 1145, 1151 (1985) ("When deciding in a

divorce case whether one party must pay periodic support to

the other, for how long, and how much, the family court

must consider all of the factors enumerated in HRS § 580-

47(a)[].”), aff'd in part, rev'd in part, 68 Haw. 383, 716 P.2d 1133 (1986).

In its Decree the family court provided four reasons as the basis for its awarding of $3,000 per month for ten years to Susan: "the length of the marriage"; "the financial conduct of the parties"; "the small amount of social security income" as Susan's "only source of continuing income (said source having been compromised by [Ira's] actions)"; and Susan's age. (Emphasis added).  While the ICA characterized the family court as actually relying on the financial condition of the parties and not Ira's financial conduct, the family court's specified justification for the alimony award appears to have taken into account Ira's financial misconduct.

Further, the family court's Decree incorrectly states that Susan's social security check would continue to be garnished by the IRS.  However, given that the family court also ordered the outstanding IRS debt to be paid in full from the escrow account of the marital property, there could be no genuine concern for the future garnishment of Susan's social security check.

Additionally, Ira argues that the family court erred in its alimony award to Susan because it awarded more money than Susan's actual needs required.  Susan provided the family court with a statement of actual expenses.  In her Income and Expense

Statement filed November 7, 2011, Susan stated that her monthly personal expenses amounted to $1,390. In her proposed divorce decree, Susan requested that the court award her alimony in a single lump-sum payment of $250,000. In its Decree, the court ordered monthly alimony in the amount of $3,000 per month for ten years, totaling $360,000 without making a finding as to the actual monthly spousal support that Susan would require based on her demonstrated needs.

Even if Ira is able to pay the additional amount of alimony, Susan is not entitled to more spousal support than is required to satisfy her demonstrated needs. See Cassiday, 6 Haw. App. at 215, 716 P.2d at 1151. The family court did not make a finding that Susan required $3,000 in monthly support and maintenance. The family court should not have awarded Susan this amount absent a finding that she required funds beyond the amount provided in her Income and Expense Statement.

Furthermore, the family court did not make any finding with respect to the large sums of money (approximately $390,000) that were deposited into Susan's personal bank account between December 2009 and April 2012, which included the reimbursement checks from her sister's convent totaling $98,034.74 and the $49,221.91 in "cashed out" funds.

On remand, the family court should make any award of alimony in accordance with the factors set out in HRS § 580-

47(a) (2006).  This requires, among other things, consideration of the needs of both of the parties and Ira's ability to pay.

## IV.    CONCLUSION

For the foregoing reasons, the ICA's January 3, 2014 Judgment on Appeal is affirmed to the extent that it vacates the family court's property division.  The ICA's January 3, 2014 Judgment on Appeal and the family court's August 22, 2012 "Decree Granting Absolute Divorce" are otherwise vacated.  This case is remanded to the family court for further proceedings consistent with this opinion.

Peter Van Name Esser and
Huilin Dong
for petitioner

Samuel P. King, Jr.
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Edward H. Kubo, Jr.

